**D.H.L. ASSOCIATES, INC., Plaintiff, Appellant,**

v.

**John O'GORMAN, Robert Wallace, Warren Allgrove, Jr, and Eileen Farrell, Individually and in their Capacity as the Tyngsborough Board of Selectmen, and as the Licensing Board for the Town of Tyngsborough, and the Town of Tyngsborough, Defendants, Appellees.**

**No. 98–1688.**

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1999.

Decided Dec. 17, 1999.

persuade defendants-appellees, the town of Tyngsborough, Massachusetts, and its board of selectmen to license it to provide nude dancing at its restaurant, "Matthew's." D.H.L. has never been successful in this endeavor because Matthew's is not located within the area of Tyngsborough zoned to allow adult entertainment. In this case, D.H.L. challenges the constitutionality of Tyngsborough's zoning ordinance, alleging that even as revised since 1994, it does not meet the standards set forth in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), and thus violates D.H.L.'s constitutionally protected freedom of speech. The district court held the ordinance to be constitutional, and from that judgment D.H.L. appeals. Finding no constitutional infirmity in Tyngsborough's zoning ordinance, we affirm.

## I. *Factual Background*

Tyngsborough, a rural town of approximately 9500 inhabitants, is located about 40 miles from Boston near the Massachusetts/New Hampshire border. The Tyngsborough board of selectmen acts as the town's executive branch and is authorized to act as the licensing authority for alcoholic beverage and entertainment licenses. Town residents voting at meetings constitute the legislative branch of the town's government and as such are responsible for enacting the zoning ordinances at issue here.

Thomas Lesser with whom William C. Newman was on brief for appellant.

Richard Bowen with whom Jonathan M. Silverstein and Christopher J. Pollart were on brief for appellees.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and LIPEZ, Circuit Judge.

COFFIN, Senior Circuit Judge.

Plaintiff-appellant D.H.L. Associates, Inc., has sought annually since 1994 to

The Town has altered its zoning ordinance multiple times in the past decade. In 1987, the Town, by a vote of the majority of residents at a town meeting, established the "B–4 zone," in which adult entertainment, as well as other commercial uses, was authorized. The B–4 zone, although existing in theory, did not actually contain any parcels of land and was, in fact, a "phantom zone." In 1992, D.H.L. applied for and was issued both an all-alcoholic beverage license and a live entertainment license for its restaurant called

"Bogie's," later called "Matthew's," located in a general commercial use zone.

In January 1994, D.H.L. advertised that it would present nude dancing beginning in February. The following month, an open town meeting was held in Tyngsborough to discuss adult entertainment and on February 24, the Town notified D.H.L. that adult entertainment was not encompassed within its entertainment license. On March 7, D.H.L. applied to amend its entertainment license to include adult entertainment, under protest based on its belief that its entertainment license inherently authorized adult entertainment. On March 28, the board of selectmen held a hearing to consider D.H.L.'s request, but delayed a decision. The next evening, as a result of a petition signed by more than 650 registered voters, a special town meeting was held to consider adopting an ordinance that would prohibit establishments holding liquor licenses from offering any form of nude entertainment.

Although the Town did not adopt such an ordinance, town residents at the meeting unanimously adopted an amended version of the zoning ordinance to establish a B–4 zone of two lots of land. The selectmen subsequently denied D.H.L.'s application to amend its entertainment license to include live nude dancing on the basis that the restaurant was not located within the B–4 zone. Each year since then, the Town has reissued D.H.L.'s entertainment license but refused to extend it to include nude dancing. Aside from a two-day license suspension in March 1994, the Town has never attempted to enforce the limitations of D.H.L.'s license or otherwise sanction it for its violation of zoning and licensing regulations, despite the fact that D.H.L. has continued to offer nude dancing on a daily basis. The Town has, however, represented to D.H.L. and to this court that it is delaying enforcement only until this litigation concludes.

In 1994, D.H.L. filed a claim against the Town and its board of selectmen in state court, alleging, *inter alia,* that its state and federal constitutional rights had been violated and seeking declaratory and injunctive relief as well as damages. Defendants successfully sought removal of the case to federal court.

Prior to trial, at a town meeting in May 1996, the Town established an entirely different B–4 zone comprised of 10.4 acres and consisting of 5 of the 24 lots in Applewood Commercial Park subdivision. It was the constitutionality of this zone that the district court upheld following a bench trial in April 1998. The district court ruled in favor of Tyngsborough on D.H.L.'s federal constitutional claims, on the grounds that the constitutionality of the 1987 and 1994 zones were moot issues and the 1996 zone was constitutional, and remanded D.H.L.'s remaining state claims to state court for adjudication. D.H.L. appeals, arguing that the issue of whether its rights were violated under the prior ordinances was not moot and that even if the 1996 ordinance were the appropriate benchmark for consideration, it was not constitutional.

## II. *Preliminary Issues*

### A. *Ripeness*

 Initially, we were concerned that D.H.L.'s claims were not ripe for review because D.H.L. has continued to provide adult entertainment despite its lack of a license without sanction. We have resolved this concern, however, because the Town has represented to the court, consistent with a selectman's testimony at trial, that it is delaying enforcement of the ordinance against D.H.L. only until this litigation concludes. Our jurisdiction as a federal court extends only to "cases" and "controversies," as authorized by Article III, Section 2, of the United States Constitution. This means that issues before us must reflect a live dispute between adverse parties.

The Supreme Court has explained that the determination of ripeness depends on "the fitness of the issues for judicial deci-

sion" and "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

In situations similar to the present one, prospective enforcement of an ordinance has been found sufficient to generate a live case. *See, e.g., Sable Communications of California, Inc. v. Pacific Tel. & Tel. Co.*, 890 F.2d 184, 187 (9th Cir.1989) ("A threat that emanates from a regulation, compulsory in nature, to which the plaintiff is currently subject, is real and immediate if the possibility of enforcement is more than hypothetical."). When a constitutional claim is at issue, a plaintiff need not "await the consummation of the threatened injury to obtain preventive relief." *Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923).

In this case, it is clear that D.H.L. is subject to a real and immediate threat of enforcement of Tyngsborough's zoning ordinance and therefore its claims are ripe for our consideration. *See Pustell v. Lynn Pub. Schs.*, 18 F.3d 50, 52 (1st Cir.1994); *Neiderhiser v. Borough of Berwick*, 840 F.2d 213, 218 (3d Cir.1988).

### B. *Mootness*

Next, we address D.H.L.'s argument that the district court erred by holding that the constitutionality of the 1987 and 1994 zones were moot issues. D.H.L. contends that these issues are, in fact, dispositive of the case. We review the court's determination of mootness *de novo*. *See Verhoeven v. Brunswick Sch. Comm.*, 1999 WL 721698, *4 (1st Cir. Sept. 21, 1999).

"Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d

491 (1969). The Supreme Court has described mootness as " 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue through its existence (mootness).' " *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (quoting Henry P. Monaghan, "Constitutional Adjudication: The Who and When," 82 Yale L.J. 1353, 1384 (1973)).

We conclude that the validity of the 1987 and 1994 ordinances are moot issues because even if we were to find the provisions unconstitutional, D.H.L. would not be entitled to any relief. First, D.H.L. cannot allege damages from the application of the 1987 or the 1994 ordinance because neither was ever enforced against D.H.L. Although D.H.L. was denied a permit under the authority of the 1994 ordinance, it continued to engage in the prohibited conduct on a daily basis without repercussion. Although a claim for damages from a no longer effective ordinance might in other circumstances save the issue of the ordinance's lawfulness from a determination of mootness, D.H.L. can make no such claim here. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 478 n. 1, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989) (plaintiff's claims not moot even though challenged ordinance repealed because town refused to grant contracts to plaintiff while ordinance was in effect).[1]

Second, we are without power to grant injunctive and declaratory relief because the 1987 and 1994 ordinances no longer exist. In *Diffenderfer v. Central Baptist Church, Inc.*, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972), the Supreme Court emphasized that it had to "review the judgment of the district court in light of [state] law as it now stands, not as it stood when the judgment below was entered."

---

1. Although D.H.L. initially requested monetary damages from the board of selectmen, it withdrew that claim in light of *Bogan v. Scott–Harris*, 523 U.S. 44, 118 S.Ct. 966, 970,

140 L.Ed.2d 79 (1998) (local legislators and non-legislative officials performing legislative functions are entitled to immunity for their official acts).

*See id.* at 414–15, 92 S.Ct. 574 (holding that when the only relief sought was a declaratory judgment that a statute was unconstitutional, but the statute was repealed pending appeal, the case was moot). The Court has also stated that when a challenged federal statute is amended after review by courts of appeals, the issues presented to the Supreme Court on appeal are rendered moot. *See United States Dep't of Justice v. Provenzano,* 469 U.S. 14, 15, 105 S.Ct. 413, 83 L.Ed.2d 242 (1984); *see also Burke v. Barnes,* 479 U.S. 361, 363, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987) (finding that case was moot when bill at issue expired after the court of appeals entered judgment and stating that "it is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing"); *United States Dep't of the Treasury v. Galioto,* 477 U.S. 556, 559–60, 106 S.Ct. 2683, 91 L.Ed.2d 459 (1986) (concluding that when statute was altered such that issues decided by court below were moot, the Court must set aside the lower court's decision).

■ D.H.L. attempts to bypass this precedent through reliance on an exception to the mootness doctrine for situations in which the defendant voluntarily ceases the challenged practice. *See City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982) (holding that when an ordinance's revision became effective while the case was pending in the court of appeals, the Court retained jurisdiction over the question of the constitutionality of the prior ordinance). This exception applies, however, only when there is a reasonable expectation that the challenged conduct will be repeated following dismissal of the case. *See id.* at 289 & n. 11, 102 S.Ct. 1070 (city had announced an intention to return to its original conduct after the litigation was

concluded); *Northeastern Florida Chapter of the Associated General Contractors v. Jacksonville,* 508 U.S. 656, 662 & n. 3, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (challenged statute had not been sufficiently altered to allow a conclusion that the conduct would not be repeated). In this case, the ordinance has been recast apparently for the purpose of making it more likely to overcome constitutional challenge and it has remained unchanged since 1996. With no indication of a contrary intent, it would be unreasonable to presume that the Town would return to its prior zoning plans after the conclusion of this litigation. Thus, the voluntary-cessation exception to the mootness doctrine is inapplicable here.

■ D.H.L. makes an additional argument that the issue is not moot, relying on a stipulation between the parties that if D.H.L. had been issued an adult entertainment license in 1994, the license would have been renewed automatically in subsequent years regardless of alterations to the zoning code. The critical flaw in D.H.L.'s analysis is that even if we were to hold that the 1994 zone had been unconstitutional, such a ruling does not necessarily lead to the conclusion that D.H.L. would have been granted a license in 1994. As D.H.L. appeared to acknowledge to the trial court, the Town would have retained the ability, after a finding of unconstitutionality, to review D.H.L.'s request and deny it for another, legitimate reason. An alternative scenario is that the Town might have created a constitutional adult entertainment zone before reviewing D.H.L.'s application for a license and could then lawfully have refused it the license.[2]

It is not for this court to speculate as to what might have happened had the Town's statute been struck down before it was superseded by the 1996 zoning ordinance now in effect. Thus, the stipulation be-

---

**2.** D.H.L. relies on two cases, both of which are distinguishable because the challenged ordinance remained in effect until the time of the court decision and was the basis for the court's grant of injunctive relief. *See Dia v.*

*City of Toledo,* 937 F.Supp. 673, 679 (N.D.Ohio 1996); *Janra Enterprises, Inc. v. City of Reno,* 818 F.Supp. 1361, 1366 (D.Nev. 1993).

tween D.H.L. and the Town, that *if* D.H.L. had received a license in 1994 it would have received a license every year thereafter, does not entitle D.H.L. to a license in the first instance.

### III. *Constitutionality of the 1996 Zoning Ordinance*

■ We thus turn to the constitutionality of Tyngsborough's 1996 zoning ordinance, currently in effect. In reviewing an appeal from an adverse ruling after a bench trial, we review the district court's legal determinations *de novo,* "according a significant amount of deference to the court's factual determinations and to most of its resolutions of mixed fact/law issues." *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 100 F.3d 175, 181 (1st Cir.1996). Tyngsborough's 1996 zoning ordinance defines "adult entertainment establishments" as including those providing live entertainment "which consists of entertainers engaging in 'Sexual Conduct' or 'Nudity.'" *See* Tyngsborough Zoning By-Laws § 2.11.46. The ordinance restricts the location of such businesses to the B-4 zone. *See id.* §§ 2.10.00, 2.11.00. It also authorizes the board of selectmen or the planning board to grant special use permits for adult entertainment establishments. *See id.* § 1.16.00.[3]

■ Generally, "[t]he power of local governments to zone and control land use

is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." *Schad v. Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981). Nevertheless, a town's zoning power "must be exercised within constitutional limits." *Moore v. East Cleveland,* 431 U.S. 494, 514, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Stevens, J., concurring). As we have articulated: "Freedom of speech is among the most precious of our constitutional rights. Thus, courts have long recognized that, when governmental action places speech in special jeopardy, special protections must apply." *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir.1995).

### A. *Appropriate Level of Scrutiny*

■ We begin our analysis by noting that the activity which is being restricted, nude dancing, is presumably constitutionally protected speech. The Supreme Court has described nude dancing as "expressive conduct within the outer parameters of the First Amendment, though .... only marginally so." *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (plurality opinion).

■ We next determine what level of scrutiny we should apply to the restric-

---

3. We note that testimony was given and the parties have stipulated to the fact that the zoning ordinance requires that adult entertainment businesses wishing to operate in the B-4 zone obtain a special permit from the board of selectmen and undergo a site review. *See* Tyngsborough Zoning By-Laws § 2.11.30 Table of Permitted Uses. Such a method of zoning combined with licensing may constitute a prior restraint on speech, generally subjected to a substantially stricter review for constitutionality than a time, place, and manner restriction. *See, e.g., FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 225, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (evaluating licensing scheme for sexually oriented businesses as prior restraint); *11126 Baltimore Boulevard, Inc. v. Prince George's County, Maryland,* 58 F.3d 988, 995 (4th Cir.1995) ("Following the

decision in *Renton,* the Court has made clear that otherwise valid content-neutral time, place, and manner restrictions that require governmental permission prior to engaging in protected speech must be analyzed as prior restraints and are unconstitutional if they do not limit the discretion of the decision maker and provide for ... procedural safeguards." (citing *FW/PBS,* 493 U.S. at 227–28, 110 S.Ct. 596) (footnote omitted)). Because D.H.L.'s permit was denied solely on the basis that it was not located in the B-4 zone, and D.H.L. does not seek review of the ordinance as a prior restraint on its speech, we evaluate the statute as a time, place, and manner restriction. We caution, however, that if the permitting process were not to incorporate adequate safeguards, it would not pass muster as a constitutional prior restraint.

tion on this constitutionally protected activity, which correlates directly to whether the ordinance is content-based or content-neutral. An ordinance is not content-neutral if the government has adopted it " 'because of disagreement with the message it conveys.' " *National Amusements,* 43 F.3d at 737 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). Further, a "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746; *see also Tollis Inc. v. San Bernardino County,* 827 F.2d 1329, 1332 (9th Cir. 1987) ("[The content-neutral] requirement is met if the involved ordinance is 'aimed to control secondary effects resulting from the protected expression' rather than at inhibiting the protected expression itself." (quoting *International Food & Beverage Sys. v. City of Fort Lauderdale,* 794 F.2d 1520, 1525 (11th Cir.1986))).

In *National Amusements,* an ordinance that prohibited the showing of motion pictures between 1:00 a.m. and 6:00 a.m. was deemed to be content-neutral because it did not reference the substance of the speech it regulated and did not appear to have arisen as a means of suppressing a particular message. *See National Amusements,* 43 F.3d at 737–39. The Court in *Renton* grappled with an ordinance that prohibited adult motion picture theaters from being located within 1000 feet of any residential zone, family dwelling, church, park, or school, and concluded that the ordinance, although it treated theaters that specialized in adult films differently from other theaters, was content-neutral because it was aimed not at the content of the films but rather at the secondary effects of such theaters on the surrounding community. *See Renton,* 475 U.S. at 47–49, 106 S.Ct. 925 (concluding that "at least with respect to businesses that purvey sexually explicit materials, zoning ordinances designed to combat the undesirable secondary effects of such businesses are to be reviewed under the standard applicable to 'content-neutral' time, place, and manner restrictions" (footnotes omitted)).

 Thus, it is clear that an ordinance such as Tyngsborough's, if aimed at combatting the secondary effects of nude dancing rather than the content of the message expressed by nude dancing, is content-neutral. In determining whether the Tyngsborough ordinance is aimed at secondary effects, we note that a town is "entitled to rely on the experiences" of surrounding cities and towns: "The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Id.* at 51–52, 106 S.Ct. 925 (holding that ordinance was validly designed to serve the substantial government interest of preserving the quality of urban life). Moreover, the Supreme Court has noted that a municipality's interest in protecting and preserving quality of life "must be accorded high respect." *See Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion); *see also Barnes,* 501 U.S. at 583, 111 S.Ct. 2456 (Souter, J., concurring) (stating that the interest of government in "preventing prostitution, sexual assault, and other criminal activity" is "plainly a substantial one").

D.H.L. challenges Tyngsborough's assurance that the ordinance was enacted to combat secondary effects and alleges that it did not rely on any "studies" of secondary effects. The district court, however, found that the record showed a "reasoned basis for evaluation of potential secondary effects as sufficiently likely to occur and to involve significant consequences for community welfare to justify the challenged zoning ordinance," even though such evidence did not appear explicitly in town meeting minutes. Specifically, the court

credited the testimony of John O'Gorman, chairman of the board of selectmen, regarding his instruction to the town administrator and the special town counsel, prior to the enactment of the 1994 zoning ordinance, to gather information about how other localities addressed adult entertainment and secondary effects issues. O'Gorman testified:

> I as the chairman of the Board of Selectmen instructed the town administrator along with special counsel to research all that they could with regard to adult entertainment, how it could be controlled, how it could be zoned, what other communities were doing, what other jurisdictions were doing with regard to adult entertainment. . . . [We did this to] learn as much as we could about adult entertainment and how it could be controlled, how it could be zoned within our community.

O'Gorman also testified that at the time of the 1994 zoning changes, the Town was aware that the two clubs in town that allegedly offered adult entertainment generated more police calls than other clubs. He stated that the public reaction to a proliferation of unlicensed adult entertainment was "tremendous" and many residents expressed great concern.

The district court also noted that a document, prepared for the 1994 special town meeting, evidenced public discussion prior to the ordinance's enactment[4] and that testimony substantiated the Town's claim that it relied on its impression, supported to at least some extent, that adult entertainment establishments placed greater demands on police because more calls were generated from those establishments. *See National Amusements*, 43 F.3d at 742 (noting that legislatures may rely on evidence of past problems with a particular activity and need not conduct an investigation to corroborate each incident). At the special town meeting, an open forum was held to educate the public on methods of zoning adult entertainment businesses and to allow citizens to express their concerns about the secondary effects of these businesses. We therefore conclude that the district court did not err in finding that ordinance was designed to combat secondary effects and is content-neutral. We also note that although secondary effects were more pointedly considered by the Town when enacting its 1994 zoning ordinance, the discussions that took place at that time can certainly be considered to pertain to the justifications of the 1996 modification of the zone.

## B. *The Application of the Renton Test*

 Because the ordinance does not create an outright ban on adult entertainment and was enacted to address the secondary effects of adult entertainment rather than its content, it is a time, place, and manner restriction. *See, e.g., Tollis*, 827 F.2d at 1332 ("Like the ordinance involved in *Renton*, the ordinance before us is obviously a time, place, and manner regulation,

---

4. The document stated in part:

> The issue of adult entertainment, as I have stated before, is extremely emotional and complex, one which requires a great deal of thoughtful, objective consideration. Our office has been grappling with this issue for only three (3) short weeks. During this period we have had to identify and understand the rights of the community, the rights afforded to operators of adult entertainment establishments and the avenues available to the community for regulating and controlling adult entertainment establishments. Additionally we have been attempting to provide proper assistance and guidance to the citizen[s] of Tyngsborough who have sought answers to very tough questions. The [Town's] Executive Administrator has devoted nearly all of his time over the past (2) weeks in pulling together information from other communities on adult ·entertainment. We have come to find out through this research that there is no quick or uniform solution to the issues before us.
>
> . . . . By law, we must be impartial and objective. . . . . We will, we *must*, rely heavily·on [advice] of our hired counsel on these legal matters. Let me say again, though, that we clearly understand your feelings on these matters. Together, as a community, [let's] work within the legal system to resolve these difficult issues.

as it does not ban adult theaters altogether."). As the Supreme Court explained in *Renton*, the intermediate scrutiny test for determining the constitutionality of a content-neutral time, place, and manner zoning restriction on adult entertainment is whether the ordinance is narrowly tailored "to serve a substantial government interest and allows for reasonable alternative avenues of communication." *See Renton*, 475 U.S. at 50, 106 S.Ct. 925 (citing *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

### 1. *Narrowly Tailored to Serve a Substantial Government Interest*

■ We have already determined that Tyngsborough considered secondary effects when it created the B–4 zone. We have also explained that a municipality's concern about secondary effects is a substantial government interest. Finally, to determine whether the ordinance fully satisfies the first prong of the *Renton* test, we must determine whether Tyngsborough's ordinance is sufficiently narrowly tailored to meet its interest.

■ A content-neutral time, place, and manner restriction is narrowly tailored if it " 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward*, 491 U.S. at 799, 109 S.Ct. 2746 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). In *Renton*, the Court held that the ordinance was narrowly tailored because it "affect[ed] only that category of theaters shown to produce the unwanted secondary effects." *Renton*, 475 U.S. at 52, 106 S.Ct. 925. In the instant case, Tyngsborough's ordinance, which applies directly to adult entertainment providers, does not reach other forms of entertainment. Further, Tyngsborough's use of a zoning mechanism to restrict such an activity confines the impact of the restriction to governance of the location of such activity and does not impact other aspects of the activity. Thus, the ordinance is sufficiently narrowly tailored to address the Town's substantial interest in combatting the secondary effects of adult entertainment.

### 2. *Reasonable Alternative Avenues of Communication*

■ Moving to the second prong of the *Renton* test, we evaluate whether Tyngsborough's ordinance allows reasonable alternative methods of communication. The essence of this question is not "whether a degree of curtailment" of speech exists, but rather "whether the remaining communicative avenues are adequate." *National Amusements*, 43 F.3d at 745 (holding that the limitations created by an ordinance were not unconstitutional because the challenger's evidence "does not call into legitimate question the adequacy of the alternate route of communication"). D.H.L. alleges that the Tyngsborough ordinance does not provide it with a reasonable opportunity to open and operate, relying heavily on the fact that only .09867% of the land within the town's borders has been designated as the B–4 zone. D.H.L. contends that even if the owner of the B–4 lots were willing to sell the land to an adult entertainment establishment, which D.H.L. contends the owner is not willing to do, such a small percentage of land does not constitute a reasonable opportunity.

D.H.L. misses the mark, however, in emphasizing this single factor. As the district court recognized, determining whether Tyngsborough's ordinance provides a reasonable opportunity for adult business to open and operate requires an evaluation of multiple factors. *See, e.g., 3570 East Foothill Blvd., Inc. v. City of Pasadena*, 912 F.Supp. 1257, 1265 (C.D.Cal.1995) ("[C]ourts have looked to a variety of relevant factors, including the percentage of land theoretically available to adult businesses, the number of sites potentially available in relation to the population of the city, the number of sites compared with the existing number of adult busi-

nesses, or the number of businesses desiring to offer adult entertainment."). Thus, the fact that Tyngsborough allocated only 10.4 acres of its 10,540 acres to the B–4 zone is relevant but not dispositive. As the Court of Appeals for the Fifth Circuit has held, "[t]here is no requirement in *Renton* ... or elsewhere that a specific proportion of a municipality be open for adult businesses or that a certain number of sites be available." *Lakeland Lounge v. City of Jackson, Mississippi*, 973 F.2d 1255, 1260 (5th Cir.1992); *see also North Ave. Novelties, Inc. v. City of Chicago*, 88 F.3d 441, 445 (7th Cir.1996) (stating that "acreage, standing alone, is largely irrelevant").

Because there is no single dispositive evaluative consideration, an analysis should encompass a variety of factors, including the percentage of acreage within the zone compared to the acreage available to commercial enterprises in general. As the district court noted, "Tyngsborough is a rural town in which the total acreage in the only commercial district that could properly be identified as the principal business district occupies very little of Tyngsborough's total acreage."

The number of sites available to adult entertainment businesses is also relevant. *See International Eateries of America, Inc. v. Broward County, Florida*, 941 F.2d 1157, 1165 (11th Cir.1991). Reasonable alternative avenues for communication have been found to exist when six adult businesses were operating in a town and more than six sites existed in the zoned area. *See Lakeland Lounge*, 973 F.2d at 1260 ("As a matter of arithmetic, ... there are

more 'reasonable' sites available than businesses with demands for them . . . .").

In this case, the district court held that all of the five lots in the B–4 zone were potentially available, crediting the testimony of Walter Eriksen, owner of the land within the B–4 zone, that although he had delayed placing the lots on the market in hopes that they would increase in value, they were now available to any purchaser for the right price.[5] Despite D.H.L.'s protestations that the cost of development would be too high, *Renton* instructs that D.H.L.'s protection extends only so far as to put adult entertainment providers on an equal footing with other purchasers and does not require that they be able to obtain sites "at bargain prices." *See Renton*, 475 U.S. at 54, 106 S.Ct. 925 ("That respondents must fend for themselves in a real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation.").[6]

Because we agree that all of the lots in the B–4 zone are potentially available and other relevant factors do not negate the significance of this availability, we hold that Tyngsborough ordinance provides the constitutionally mandated "reasonable opportunity to open and operate." We note that one other establishment, the "Blue Moon," has lawfully offered adult entertainment in Tyngsborough since before the enactment of the 1987 zoning ordinance and thus has a right to continue operating despite the fact that it is not located in the B–4 zone. Although the Blue Moon operates on a grandfather permit, even if it were to be required to move into the B–4

---

5. We note that we have viewed Eriksen's expression of distaste for adult entertainment establishments at the 1994 town meeting. We disagree with D.H.L., however, that this makes the lots unavailable to it. There is no indication in the record that Eriksen will attempt to unilaterally repeal the ordinance by refusing to sell to adult entertainment establishments, especially in light of the funds that he has committed to the development of the commercial park and his willingness to sell to any purchaser for the right price.

6. D.H.L. contends that the fact that restrictive covenants that would have prohibited adult entertainment were considered by the landowner also indicates that the zoned lots are not available. As the district court noted, the restrictive covenants were not imposed, and if they had been, the case would be entirely different.

zone, which it is not, that would leave five sites for two businesses.

Moreover, each of the five lots, as stipulated by the parties, is suitable for development and has gas, water, and electrical lines available. The sites are accessible to the public as they are located in a commercial park with newly developed roadways. Although the parties have not supplied us with data about the number of businesses that would like to offer adult entertainment, we have not been shown that any business except D.H.L. has been denied an adult entertainment permit since the enactment of the 1996 zone. For these reasons, we hold that Tyngsborough's ordinance provides D.H.L., and other businesses wishing to offer adult entertainment, with a reasonable alternative avenue for communicating their constitutionally protected speech.

### IV. *Certification*

On a final note, we address very briefly D.H.L.'s argument that the district court erred by declining to certify state law questions to state court prior to determining the federal constitutional issues. Because we are not convinced that state law provides an independent and sufficient basis for deciding the case, we conclude that the district court did not err by remanding the case to state court for determination of D.H.L.'s remaining state law claims after its adjudication of the federal issues.

In conclusion, because we hold that the constitutionality of the 1987 and 1994 Tyngsborough zoning ordinances is moot and the existing ordinance is constitutional, the judgment of the district court is affirmed.