# United States Court of Appeals
## For the First Circuit

No. 12-1758

GARY LUND, d/b/a CLUB MARTINIQUE,

Plaintiff, Appellant,

v.

CITY OF FALL RIVER, MA; JAMES HARTNETT, City Planner; FALL RIVER
ZONING BOARD OF APPEALS; DAVID ASSAD, as Chairman of the Fall
River Zoning Board of Appeals; GENE ALVES, as Vice Chairman of
the Fall River Zoning Board of Appeals; RICHARD MATEUS, as Member
of the Fall River Zoning Board of Appeals; ANDREA
MEROLLA-SIMISTER, as Member of the Fall River Zoning Board of
Appeals; JOHN FRANK, III, as Member of the Fall River Zoning
Board of Appeals,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Brian R. Cunha, with whom Brian Cunha & Associates, P.C. was
on brief, for appellant.
Elizabeth Sousa, with whom the Office of the Corporation
Counsel was on brief, for appellees.

April 22, 2013

---

* Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**SOUTER, Associate Justice.** Appellant, Gary Lund, contends that the City of Fall River's zoning ordinances violate the First Amendment by preventing him from opening an adult entertainment establishment on land zoned industrial without providing an adequate opportunity elsewhere. The district court rejected his claim, and we affirm.

I

By the terms of a Fall River ordinance, intending providers of adult entertainment must obtain a "special permit," see Revised Code of Ordinances of the City of Fall River, Mass., Rev. Ordinances § 86-85, which may be granted only if the applicant meets a variety of zoning conditions, see id. §§ 86-88, 86-201. So far as it matters here, § 86-88 mandates a minimum amount of parking proportional to the size of the building to be used and requires it to be surrounded by a four-foot, landscaped perimeter. All parking and loading structures must be at least 50 feet from any street and 750 feet from any residence. Section 86-201 forbids adult entertainment on a site within an "Industrial District."

Lund applied for a special permit to open "Club Martinique" at 139 Front Street, even though he conceded that his proposal failed to comply with the ordinance. See J.A. 17. 139 Front Street is within an Industrial District and is thus disqualified as a site for adult entertainment by § 86-201, and beyond that his proposal would have violated § 86-88 owing to the

presence of parking spaces closer than 50 feet to the street and the absence of landscaping.  When the City denied his application, Lund appealed to the Zoning Board of Appeals for variances from the ordinances, which the Board denied, noting the unequivocal language of §§ 86-88 and 86-201.  See, e.g., id. § 86-88 ("Any building . . . containing an adult use shall meet the setback requirements . . . ."); id. § 86-201 ("In an Industrial District, no structure shall be used except for one of the following uses: Existing mill buildings may be used for art use, except adult use as defined in section 86-81 is prohibited."  (ellipses omitted)).

Lund then went to the Superior Court of the Commonwealth of Massachusetts for declaratory and injunctive relief, as well as compensatory damages, alleging that the City's ordinances violate the First Amendment.  He contended that sections 86-88 and 86-201, individually and in combination, "den[y him] a reasonable opportunity and accommodation to open and operate, within the City, an adult entertainment club." J.A. 21.  The City removed the case to the district court, see 28 U.S.C. § 1441(a), which had jurisdiction under 28 U.S.C. § 1331.

There, the scope of disagreement narrowed substantially after an evidentiary hearing on Lund's request for preliminary injunction, in which he and the City offered expert testimony about the amount of legally available land in the City.  At the close of evidence, Lund's counsel stated, "I don't think that there's any

-3-

facts (sic) in dispute here. And I know I said at the beginning just a preliminary injunction, but I don't see why . . . you can't make a summary judgment decision as well. I don't think there's any factual dispute . . . between the two experts. There are different scenarios that they've presented . . . ." Evidentiary Hearing Tr. 59, June 3, 2010. The district court responded that the disputed question was fairly discrete, as addressing the last of the conditions to be met by adult commerce regulation subject to intermediate scrutiny under City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986): whether the ordinances blocking the proposed adult use provide reasonable alternative means for Lund to conduct his adult entertainment business.

> THE COURT: If that's the framing of the issue . . . then I think we have all the evidence we need to decide the merits of the case one way or the other.
> MR. CUNHA [plaintiff's counsel]: And I don't disagree.
> THE COURT: Does the [C]ity disagree with that?
> MS. PEREIRA [defendants' counsel]: No, your Honor.

Evidentiary Hearing Tr. 60, June 3, 2010; see also Lund v. City of Fall River, No. 10-10310, 2012 WL 1856947, at *2 (D. Mass. May 22, 2012) ("Lund conceded that the sole question presented here is whether sections 86-88 and 86-201 provide reasonable alternative avenues of communication.").

After consideration, the district court entered judgment for the City on the authority of Renton. See Lund, 2012 WL 1856947, at *2-6. The court found that out of the City's 11,783 developable acres, 28.53 acres (or 0.24%), on 8 separate sites, are

available as adult entertainment venues.  Id. at 5-7.  The court thus rejected Lund's objections that he could not have adequate space within that acreage without combining multiple parcels and undertaking costly redevelopment to comply with the ordinances; the district court declined to declare any of the 28.53 acres unavailable due to such "economic" considerations.  See id. at 7-11.  Finally, the court held that 0.24% of the City provided Lund with reasonable room to exercise his protected expressive right, id. at 9-11, relying upon our decision in D.H.L. Associates, Inc. v. O'Gorman, 199 F.3d 50, 60 (1st Cir. 1999), which found no constitutional deprivation in municipal zoning that left only 0.09% of developable land available for adult entertainment.

This timely appeal followed, there being no question of our jurisdiction under 28 U.S.C. § 1291.

II

The standard of review that we apply turns on the character of the proceeding in the period after the case was submitted to the court at the end of the colloquy just quoted. Lund's counsel expressly proposed treating his motion for a preliminary injunction as a motion for summary judgment, which would leave it to the court to draw fair inferences from the undisputed material facts and determine whether Lund was entitled to judgment as a matter of law.  See Jirau-Bernal v. Agrait, 37 F.3d 1, 3 (1st Cir. 1994).  Presumably he intended the court to act

-5-

as if cross-motions for summary judgement were before him, and so to grant judgment for the City if it was entitled to it as a matter of law.  Looked at this way, the case here would present only issues of fair inference and legal entitlement, which we would review de novo, as on a conventional appeal from summary judgment. See Shafmaster v. United States, 707 F.3d 130, 135 (1st Cir. 2013).

But the colloquy did not end with simple assent to proceed on summary judgment.  The court's response spoke of "hav[ing] all the evidence we need to decide the merits of the case one way or the other," and each counsel went on record as having no disagreement.  This sounds more like an agreement for plenary submission of the case to the judge as fact-finder, and this is what the judge ultimately understood.  His order here on appeal begins with citation to Federal Rule of Civil Procedure 65, subsection (a)(2) of which authorizes a court to "advance the trial on the merits and consolidate it with the hearing" on a motion for preliminary relief.  This also seems to be what Lund's counsel understood he had agreed to, for his appeal addresses the merits of the ruling, not the procedural propriety of the route to reaching it.  Accordingly, we think the better view is to see the order appealed not as one of summary judgment, but as the product of the procedural crawl that then-Judge Breyer described in Federacion de Empleados del Tribunal Gen. de Justicia v. Torres, 747 F.2d 35 (1st Cir. 1984).

> [W]here, in a nonjury case, 'the basic dispute between the parties concerns the factual inferences . . . that one might draw from the more basic facts to which the parties have drawn the court's attention,' where '[t]here are no significant disagreements about those basic facts,' and where neither party has 'sought to introduce additional factual evidence or asked to present witnesses' . . . . the standard for appellate oversight shifts from de novo review to clear-error review.

EEOC v. Steamship Clerks Union, Loc. 1066, 48 F.3d 594, 603 (1st Cir. 1995) (quoting Federacion de Empleados del Tribunal Gen. de Justicia, 747 F.2d at 36). It follows that our review standard is for clear error on all issues not purely legal, though we will be candid to say that the result would be the same if the examination were de novo.

### III

Lund's exceptions to the district court's ruling boil off at two. He contends it was error to find that 28.53 acres on 8 sites were "available" for adult entertainment, and he argues that the available land does not provide him a reasonable opportunity to open an adult business.

### A

After testimony and evidence from both parties' experts, the district court adopted the City's contention that the ordinances left 28.53 acres for adult entertainment, being 0.24% of the City's developable land, comprising 8 sites. The court found that Lund's contrary assertions "lack[ed] evidentiary support, whereas the City's figure [was] well-supported by the testimony and

exhibits presented." <u>Lund</u>, 2012 WL 1856947, at *3. Lund argues the contrary on three grounds.

First, despite his concession in the district court that no further trial proceedings were necessary, he says now that a remand is needed to determine the effect of the § 86-88 limitation that "[p]arking and loading facilities . . . be set back a minimum of . . . 750 feet from any structure used . . . for residential purposes." He concedes that the district court correctly considered § 86-88's 750-foot buffer requirement with respect to parking but argues that it failed to assess the impact of applying it to loading facilities. But the answer is that Lund never raised this claim below. Save for his quotation of the ordinance in a footnote, the word "loading" does not appear in his motion for a preliminary injunction, and he did not make this argument at the hearing. That is the end of the matter here. <u>See</u> <u>McCoy v. Massachusetts Institute of Technology</u>, 950 F.2d 13, 22 (1st Cir. 1991) ("[T]heories not raised squarely in the district court cannot be surfaced for the first time on appeal.").

Second, Lund points out that excluding sites covered by long-term leases or requiring costly redevelopment would greatly diminish the quantity of land "available," and he contends that declining to weigh the consequences of these leases and costs in figuring the quantity of available land in the City was error. The district court rejected this claim as "primarily one of economic

-8-

impact upon his speech-related business," a consideration that the Supreme Court "has cautioned against considering in First Amendment analyses." Lund, 2012 WL 1856947, at *3.

The district court was correct. The proper enquiry looks to restrictions imposed by the government, not to the market effects of other people's commerce or the economics of site clearance. Even if we credit Lund's representation that sites identified by the district court are subject to long-term leases, the fact that other competing private parties got ahead of him is not alone of any moment in the constitutional analysis, and the cost of development is nothing more than a business consideration for Lund to weigh. As the Renton Court put it, "That [plaintiffs] must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation." 475 U.S. at 54; accord D.H.L. Associates, 199 F.3d at 60. Hence, whether it makes sense for Lund to finance a costly redevelopment or to pay what current tenants would demand to break their leases are simply private business considerations.[1] It is worth noting that our sister

---

[1] It is true, as Lund notes, that we said in D.H.L. Associates that the case would have been "entirely different" if the land had been encumbered by restrictive covenants precluding its use for adult entertainment. Appellant's Br. 32-33 (quoting 199 F.3d at 60 n.6). Lund argues that D.H.L. Associates makes clear that restrictive covenants are, therefore, relevant to the availability determination. Maybe so. But restrictive covenants are substantive land-use restrictions enforceable by the governmental power of the courts, and, in any case, Lund failed to offer any

circuits have been quick to reject similar arguments.  See, e.g., David Vincent, Inc. v. Broward Cnty., Fla., 200 F.3d 1325, 1334 (11th Cir. 2000) ("[T]he economic feasibility of relocating to a site is not a First Amendment concern."); Ambassador Books & Video, Inc. v. City of Little Rock, Ark., 20 F.3d 858, 864-65 (8th Cir. 1994) ("[T]he cost factor is unimportant in determining whether the ordinance satisfies the standards of the First Amendment."); World Wide Video of Wash., Inc. v. City of Spokane, 368 F.3d 1186, 1199-200 (9th Cir. 2004).

Third, Lund assigns error to the district court's finding of 8 sites available for adult use.  He argues that treating parcel C-11-7 as a possible site for more than one adult business was incorrect because its access drive would need to be relocated and the existing structure torn down.  He argues that parcels D-19-1, D-19-91, and D-19-93 could not accommodate 6 sites, as the district court found, because the lots would require sub-division.  But Lund gives us no reason to see these as anything more than further economic arguments that the district court rightly declined to consider.

Lund also contends that parcels D-19-1, D-19-91, and D-19-93 could not meet § 86-88's requirement of a 50-foot setback from the street, contrary to evidence introduced by the City.  Its

---

evidence credited by the district court on that issue.  The closest he comes to suggesting otherwise is in a reference to an affidavit that speaks of "restrictions" without further detail.  J.A. 73.

expert testimony, which the district court credited, was that access drives could be constructed from William S. Canning Boulevard that would permit the buildings to be located 50 feet from the road and thus allow for 6 adult sites. See Evidentiary Hearing Tr. 46-47, June 3, 2010. We have reviewed the maps submitted by the parties, along with the relevant testimony, and see no error in the district court's acceptance of the City's testimony that these parcels could have accommodated 6 sites. Lund's argument about the potential of these parcels therefore fails to discredit the district court's conservative estimate that 8 sites were available overall. See Lund, 2012 WL 1856947, at *5 n. 10 ("The actual number available is surely greater.").

* * *

In sum, we find no error in the district court's calculation of available land and now turn to the constitutional question.

B

That calculation prefaces the last of the questions to be addressed under the Renton scheme for analyzing a First Amendment challenge to zoning that limits adult businesses. If a zoning code passes muster as a time, place, and manner regulation, if it is content neutral, and if it advances a substantial governmental interest, the question remaining is whether it leaves reasonable means of commercial adult activity as an alternative to its

restrictions.[2] See Renton, 475 U.S. at 46-54; see also City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 433-34 (2002) (plurality op.) (discussing the Renton framework); D.H.L. Associates, 199 F.3d at 58-59 (same). Lund has conceded that the ordinances survive Renton's first two enquiries and that the City's interest is substantial, Lund, 2012 WL 1856947, at *2, leaving only the issue of whether the district court correctly concluded that the land available under the ordinances allows for "reasonable alternative avenues of communication." Renton, 475 U.S. at 50; see also id. at 54 ("[T]he First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theatre . . . .").

In D.H.L. Associates, we explained that this enquiry does not ask "'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" 199 F.3d at 59 (quoting Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 745 (1st Cir. 1995)). A reviewing court looks to "multiple factors," including "the percentage of acreage within the zone [for adult business use] compared [with] the acreage available

_____

[2] In the district court, Lund argued that the only issue was the sufficiency of space and sites to qualify as reasonable opportunity. See supra p. 4. In his brief here, he has suggested in passing that the complete ban on adult business in the industrial zone removes the ordinances from the category of time, place, and manner regulations, so as to entail more demanding scrutiny. He is obviously mistaken and in any event waived the point in the district court.

to commercial enterprises" and "[t]he number of sites available to adult entertainment businesses," D.H.L. Associates, 199 F.3d at 59-60, there being "no single dispositive evaluative consideration." Id. at 60.

This comprehensive canvas accords with the approaches of other circuits, which have understood the final Renton prong as calling for a general assessment of whether the ordinances "afford a reasonable opportunity to locate and operate such a business." TJS of N.Y., Inc. v. Town of Smithtown, 598 F.3d 17, 22 (2d Cir. 2010); see also Isbell v. City of San Diego, 258 F.3d 1108, 1112 (9th Cir. 2001) ("whether [the number of sites] . . . afford[s] . . . a reasonable opportunity"); Big Dipper Entm't, L.L.C. v. City of Warren, 641 F.3d 715, 719 (6th Cir. 2011) (whether "a 'reasonable opportunity' to open"); accord BZAPS, Inc. v. City of Mankato, 268 F.3d 603, 606 (8th Cir. 2001) (rejecting similar challenge because "numerous locations . . . remain available"); Ctr. for Fair Pub. Policy v. Maricopa County, Arizona, 336 F.3d 1153, 1170 (9th Cir. 2003) (statute survives "unless the government enactment will foreclose an entire medium of public expression [in] a particular community" (internal quotation marks omitted)). The enquiry is necessarily "fact-intensive," Big Dipper Entertainment, L.L.C., 641 F.3d at 719, and the issue of reasonable opportunity "must be resolved on a case-by-case basis," Fly Fish, Inc. v. City

<u>of Cocoa Beach</u>, 337 F.3d 1301, 1310 (11th Cir. 2003) (internal quotation marks omitted).

Here, we think the ordinances provide Lund the opportunity required. This conclusion claims substantial support from <u>D.H.L. Associates</u>, where we found no First Amendment violation in a Town's restriction of all but 0.09% of developable land from adult entertainment purposes. The percentage available here is more than twice as great, with 8 sites available in the City, as compared with the 5 that we held sufficient in <u>D.H.L. Associates</u>. Lund cannot break free of the gravitational pull of that case.[3]

Lund calls <u>D.H.L. Associates</u> a distinguishable case and faults the district court for not dealing with the differences between the Town of Tyngsboro (the defendant in <u>D.H.L. Associates</u>) and the City of Fall River. Lund cites the City's urban character, its larger land mass, the comparatively small number of parcels available for sale, the lack of an "adult overlay district" (in contrast to Tyngsboro), the ban on adult entertainment in the

---

[3] There are cases from some circuits that would proceed differently if presented with evidence of strong competition from other adult entertainment companies vying for scarce real estate in the City. See <u>Fly Fish, Inc.</u>, 337 F.3d at 1309 (contrasting cases that adopt a bright-line rule in which an ordinance can survive only if "there are more reasonable sites available than businesses with demand for them" with cases that adopt a more contextual supply-and-demand test (internal quotation marks and citations omitted)). We express no opinion on this question because, as the district court noted, "neither party has presented evidence that anyone other than Lund has opened or has sought to open an adult entertainment business under these ordinances." <u>Lund</u>, 2012 WL 1856947, at *5.

City's Industrial District, and the City's lack of an explanation for banning adult entertainment there.  See Appellant's Br. 38-44.

But the district court made just the comparison Lund stresses, in contrasting rural Tyngsboro with Fall River, "one of the largest industrial cities in Massachusetts," Lund, 2012 WL 1856947, at *5, while recognizing that "D.H.L. Associates, Inc. teaches only that a somewhat higher level of available land might be necessary to assure reasonable alternative locations in a developed urban environment than in an undeveloped rural one," id. The court's conclusion thus rested on explicit consideration of the City's urban nature, and the City's larger land mass was fully acknowledged in evaluating the percentage of available land.  The number of parcels available for sale is an economic consideration that has no role in the constitutional analysis, and if the City chooses to allow adult businesses in shopping centers but not in factory districts, there is nothing obviously suspect in the choice.  In sum, the differences Lund identified between this case and D.H.L. Associates fail to render the precedent inapt or the district court's analysis inadequate.

Lund's remaining points touching on § 86-201 are essentially policy differences with the City, which do not rise to the level of First Amendment significance.  Because the City has provided Lund with a reasonable opportunity for conduct protected by the First Amendment, we affirm the district court's judgment.

*It is so ordered.*