**SHOWTIME ENTERTAINMENT LLC, Plaintiff,**

v.

**Mike AMMENDOLIA, in his official capacity, Lawney Tinio, in his official capacity, and the Town of Mendon, Defendants.**

**Civil Action No. 10–40194–FDS.**

United States District Court,
D. Massachusetts.

Aug. 9, 2012.

See also 885 F.Supp.2d 479, 2012 WL 996805.

---

512

Michael E. Aleo, Lesser, Newman & Nasser, LLP, Thomas Lesser, Lesser, Newman, Souweine & Nasser, Northampton, MA, for Plaintiff.

Robert S. Mangiaratti, Murphy, Hesse, Toomey & Lehane, LLP, Quincy, MA, Geoffrey B. McCullough, Murphy, Hesse, Toomey & Lehane, LLP, Boston, MA, for Defendants.

Brandon H. Moss, Murphy, Hesse, Toomey & Lehane, LLP, Quincy, MA, for Plaintiff/Defendants.

### MEMORANDUM AND ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This action arises from the efforts of plaintiff Showtime Entertainment LLC to open a club in Mendon, Massachusetts, that will feature live nude dancing. Adult-entertainment establishments in Mendon are required both to obtain a license under Mass. Gen. Laws ch. 140, § 183A and to comply with applicable zoning by-laws of the town. Showtime filed this lawsuit after the town's Board of Selectmen granted its second license application. It contends that four provisions of the town's by-laws are facially invalid because they impermissibly restrict expression that is protected by the First and Fourteenth Amendments

of the Constitution and by Article 16 of the Massachusetts Declaration of Rights.

On March 22, 2012, 885 F.Supp.2d 479, 2012 WL 996805 (D.Mass.2012), this Court granted plaintiff's first motion for summary judgment, ruling that one aspect of the special-permit requirement for adult-entertainment establishments under the by-laws created an impermissible prior restraint on expression. Plaintiff has now filed three new motions for summary judgment in which it seeks rulings that the three remaining provisions of the by-laws that it challenges are invalid. Defendants have cross-moved for summary judgment on each of the counts raised in plaintiff's motions. Plaintiff has also moved for attorneys fees' as to its first summary-judgment motion.

For the following reasons, plaintiff's motions will be denied and defendant's cross-motion will be granted. Plaintiff will be awarded $24,754.56 in fees and costs incurred in relation to its first summary-judgment motion.

## I. *Background*

In May 2008, the Town of Mendon adopted a set of zoning by-laws that established an adult-entertainment overlay district consisting of four lots on Milford Street (Route 16). (Pl.'s Facts # 2 ¶ 1).[1] For purposes of the new by-laws, an adult-entertainment establishment was defined as "an Adult Bookstore, an Adult Motion Picture Theater, an Adult Video Store, [or] an Establishment which displays live nudi-

ty for its patrons." (Pl.'s Appx. # 2 at 1). The by-laws also set forth rules for the operation of such businesses within the district. (Pl.'s Facts # 2 ¶ 1).

Any bar or restaurant that seeks to present nude dancing in Mendon is also required by Massachusetts law to obtain an entertainment license from the Mendon Board of Selectmen, the town's local licensing authority. (Pl.'s Appx. # 2 at 4).[2] On June 2, 2008, the Board adopted regulations addressing licensing for adult-entertainment businesses in the town. (*Id.* at 4–26). Under those regulations, license applications are reviewed for compliance with both Massachusetts law and applicable by-laws of the town. (*Id.* at 12).

Defendant Showtime Entertainment LLC is a Massachusetts limited liability company that owns 49 Milford Street, a parcel that lies within the adult-entertainment overlay district. On June 8, 2008, Showtime applied for a license to present nude dancing at a club that it proposed to build on the Milford Street lot. (*Id.* at 27–31). Its application indicated that the building would have an area of 8,935 square feet, with 244 seats and 82 parking spaces. (*Id.* at 34–35). A public hearing on Showtime's application was held on September 15, 2008, at which representatives of the company presented details of their proposed establishment and several town residents testified to potential traffic concerns in the area. (Pl.'s Facts # 2 ¶ 1). On October 1, the Board denied Showtime's application, finding that the pro-

---

**1.** The by-laws were promulgated pursuant to the Home Rule Amendment to the Massachusetts Constitution and Mass. Gen. Laws ch. 40A, § 9, which provides that "[z]oning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit." (*Id.* at 1).

**2.** *See* Mass. Gen. Laws ch. 140, § 183A ("No [establishment subject to the statute's licens-

ing authority] shall, as a part of its usual business, offer to view, set up, set on foot, maintain or carry on a concert, dance exhibition, cabaret or public show of any description, unless and until a license therefor has been issued by the licensing authorities."); *see also* Mass. Gen. Laws ch. 140, § 1 (providing that a town's licensing authority is its board of selectmen).

posed adult-entertainment business would adversely affect the public health, safety, and order because it could not be operated so as to prevent an increase in criminal activity, noise pollution, and traffic. (Pl.'s Appx. # 2 at 39–41).[3]

On October 7, in response to a petition by Mendon residents to amend the town's by-laws as they relate to adult-entertainment establishments, the town held a special town meeting. (*Id.* at 39–41, 52). The amendment proposed to change both the town's zoning by-laws and its general by-laws to impose various restrictions on the operation of adult-entertainment establishments. (*Id.* at 52–54). Article I of the amendment would add a section to the zoning by-laws providing that adult-entertainment establishments may not exceed 2,000 square feet in area and 14 feet in height, and prohibiting adult-entertainment establishments from opening for business before 4:30 p.m. on days when school is in session. (*Id.* at 52–53, 238).[4] Article II proposed to create a section in the town's general by-laws banning the sale or consumption of alcohol in adult-entertainment establishments. (*Id.* at 53–54; Pl.'s Appx. # 4 at 112).[5]

At the October 7 meeting, members of a citizens' group, Speak Out Mendon, spoke out in support of the proposed amendment, citing the adverse effects of adult-entertainment businesses on property values, crime rates, and quality of life. (Def.'s Ex. A at 121, 124–28). Those present at the meeting voted to approve both articles of the proposal. (Pl.'s Appx. # 2 at 52–55).

The Massachusetts Attorney General subsequently reviewed the amendment and issued an opinion letter on the matter on January 20, 2009. (*Id.* at 67–70).[6] The letter approved Article I in its entirety. (*Id.* at 67). It disapproved and deleted one section of Article II that prohibited the location of any adult-entertainment establishment within 750 feet of a business licensed to sell alcohol. (*Id.* at 68). However, the four other sections, which prohibited the consumption and sale of alcohol within adult-entertainment establishments, were approved based on a finding that their statutory and constitutional validity was at least "fairly debatable." (*Id.*).

Showtime subsequently renewed its application for a license to present nude dancing. (Pl.'s Appx. # 2 at 157–58). A hearing on the application was held on April 5, 2010. (*Id.*). At that hearing, Showtime presented the findings of a traffic impact and access study it had commissioned from Greenman–Pedersen, Inc. (*Id.* at 158). The study concluded that "[p]eak-hour traffic volume increases as a result of the development are expected to have negligible impacts on Milford Street. . . ." (*Id.* at 93). During the April 5 hearing, the study was criticized by town residents because it was based on an assumption that the proposed establishment would be 6,800

---

3. Showtime appealed the denial of its application in Worcester Superior Court, but the case was later dismissed by stipulation of the parties. (Pl.'s Facts # 2 ¶ 11).

4. No other type of business or establishment is subject to similar restrictions on its size or hours of operation by the town's by-laws. (*Id.* at 207–39).

5. Mendon has not banned the sale or consumption of alcohol within any other type of business. (Pl. Appx. # 4 at 57–123).

6. Mass. Gen. Laws ch. 40, § 32 provides that "before a [municipal] by-law takes effect it shall be approved by the attorney general or ninety days shall have elapsed without action by the attorney general after the clerk of the town in which a by-law has been adopted has submitted to the attorney general a certified copy of such by-law with a request for its approval. . . ." The state attorney general reviews municipal regulations with deference and has only limited power of disapproval. *Amherst v. Attorney General*, 398 Mass. 793, 796, 502 N.E.2d 128 (1986).

square feet in area and because it failed to account for traffic from a nearby drive-in theater. (*Id.* at 158–59).[7]

On May 3, 2010, the Board granted Showtime's application to present nude dancing at the Milford Street site, subject to all applicable by-laws and regulations of the town, as well as various other conditions. (*Id.* at 160–68). Thus, Showtime's license is conditioned on its compliance with the size and hours restrictions provided in Mendon's zoning by-laws and with the alcohol restriction in the general by-laws. (*Id.* at 162). Showtime asserts that but for those by-laws, it would re-apply for a license to operate a larger establishment at which alcohol would be served.

Showtime commenced this lawsuit on October 5, 2010. The complaint alleges that the following elements of the town's by-laws are invalid under the First Amendment of the Constitution and Article 16 of the Massachusetts Declaration of Rights: (1) a requirement that adult-entertainment establishments obtain a special permit from the town zoning board (Counts 1 and 2), (2) the size restrictions limiting such businesses to buildings less than 2,000 square feet in area and 14 feet in height (Counts 3 and 4), (3) the hours restriction prohibiting such businesses from operating before 4:30 p.m. on days when school is in session (Counts 5 and 6), and (4) the alcohol restriction prohibiting such businesses from allowing alcohol to be served or consumed on their premises (Count 7). The complaint also alleges that each of the by-law provisions violates Showtime's rights under the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11I.

On March 22, 2012, this Court granted summary judgment in favor of Showtime

as to Counts 1 and 2, ruling that the special-permit requirement was an impermissible prior restraint on expression because it gave the zoning board excessive discretion in deciding whether to issue a permit. However, because the Court found that the permit requirement was severable, the other restrictions in the zoning by-laws that Showtime challenges were unaffected by that decision.

In its second, third, and fourth motions for summary judgment, Showtime now seeks a ruling in its favor as to the remaining counts of the complaint. The town has cross-moved for a ruling that the by-laws do not unduly infringe Showtime's rights. Finally, Showtime has moved for an award of attorneys' fees and costs related to its first summary-judgment motion.

## II. *Summary Judgment Motions*

### A. *Standard of Review*

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). "Essentially, Rule 56[ ] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir.1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In making that determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir.2009).

---

**7.** Other issues that were raised at the hearing include the adequacy of the water supply on the property, outstanding tax liens and judgments against the principals of Showtime,

and an unresolved enforcement order concerning wetlands on the site of the proposed club. (*Id.* at 158–60).

■ "Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 230 (1st Cir.1996) (internal citations omitted).

## B. General Principles

■ The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." The Fourteenth Amendment extends this principle to laws passed by state and local governments. *See Brown v. Entertainment Merch. Ass'n*, —— U.S. ——, 131 S.Ct. 2729, 2742, 180 L.Ed.2d 708 (2011). As a general matter, freedom of speech "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002). This protection covers entertainment as well as political speech and reflects the constitutional principle that "esthetic and moral judgments about art ... are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). The Supreme Court has expressly held that non-

obscene nude dancing is "expressive conduct within the outer perimeters of the First Amendment, though ... only marginally so." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

■ Article 16 the Massachusetts Declaration of Rights provides that "[t]he right of free speech shall not be abridged." The Supreme Judicial Court has held that nude dancing is also a protected form of expression under Article 16, but it declined to adopt the qualified language used by the Supreme Court. *Mendoza v. Licensing Bd.*, 444 Mass. 188, 196, 827 N.E.2d 180 (2005); *Commonwealth v. Sees*, 374 Mass. 532, 536, 373 N.E.2d 1151 (1978); *see also Cabaret Enterprises, Inc. v. Alcoholic Beverages Control Com.*, 393 Mass. 13, 16–17, 468 N.E.2d 612 (1984) ("For the purpose of assessing the amount of protection to which nude dancing is constitutionally entitled, we declined in *Sees* to distinguish between bar-room-type nude dancing and performances of greater artistic or socially redeeming significance."). It is clear that, at least in some circumstances, Article 16 "may provide greater protection for nude dancing than the First Amendment." *Mendoza*, 444 Mass. at 191, 827 N.E.2d 180.[8]

■ Plaintiff—which has not been denied a license or been subject to sanctions for violating the town's restrictions on adult-entertainment establishments—challenges the by-laws on their face. In the First Amendment context, a plaintiff who challenges a statute on its face "ordinarily must show either that the law admits of no

---

**8.** For example, Article 16's guarantee of free expression has explicitly been held to be broader than that of the federal Constitution as applied to public indecency statutes that have the effect of banning nude dancing. *Compare Mendoza*, 444 Mass. at 191, 827 N.E.2d 180 (invalidating, under Article 16, a

town's indecency ordinance that banned public nudity) *with Pap's A.M.*, 529 U.S. at 302, 120 S.Ct. 1382 (plurality opinion) (upholding, under the First Amendment, an ordinance that banned public nudity as a content-neutral regulation targeting the secondary effects of nude dancing).

valid application or that, even if one or more valid application exists, the law's reach nevertheless is so elongated that it threatens to inhibit constitutionally protected speech." *McGuire v. Reilly,* 260 F.3d 36, 47 (1st Cir.2001). The Court will address the validity of the zoning by-laws (the size restrictions and the hours restriction) and of the general by-laws separately.

## C. *Zoning By–Laws (Size and Hours Restrictions)*

The size and hours restrictions are contained in Section 5.01(i) of Article V of the town's zoning by-laws. As passed by the town and approved by the Massachusetts Attorney General, the size restriction provides:

1. No Adult Entertainment or Use facility shall exceed 2,000 square feet in footprint in keeping with the historically rural atmosphere of the town and in consideration of traffic safety.

2. Any Adult Entertainment or Use facility shall not exceed 14' in structural height.

(Pl.'s Appx. # 2 at 52; Def.'s Ex. B at 27–28). The hours restriction provides:

4. No Adult Entertainment or Use facility shall open for business prior to 4:30pm ... on days in which school is in session in order to provide an opportunity for all elementary school buses to finish student bus routes.

(Pl.'s Appx. # 3 at 50; Def.'s Ex. B at 28).

### 1. *Level of Scrutiny*

The Supreme Court addressed the standard for constitutional review of municipal zoning ordinances that target adult entertainment in *Renton v. Playtime Theatres,* 475 U.S. 41, 46, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986). Under *Renton,* the degree of scrutiny applied to a law that regulates adult entertainment without imposing an absolute ban is determined by whether the ordinance is content-based. A content-based restriction—that is, one that aims to suppress the purveyance of sexually explicit material itself—is subject to strict scrutiny. *Playboy Entertainment,* 529 U.S. at 815, 120 S.Ct. 1878. Such a restriction will be invalid unless the government can prove that the law is "narrowly tailored to promote a compelling Government interest." *Id.* at 813, 120 S.Ct. 1878. On the other hand, where the "predominate concern" of a municipality in adopting a zoning regulation is to alleviate the negative secondary effects that adult-entertainment businesses may have on surrounding communities, the ordinance is deemed a content-neutral time, place, and manner restriction subject to an intermediate level of scrutiny. *City of Los Angeles v. Alameda Books,* 535 U.S. 425, 433, 122 S.Ct. 1728, 152 L.Ed.2d 670 (2002) (plurality opinion); *see Renton,* 475 U.S. at 45, 106 S.Ct. 925.[9] Such a regulation will be upheld if the municipality can establish that "the ordinance is narrowly tailored 'to serve a substantial government interest and allows for reasonable alternative avenues of communication.'" *D.H.L. Assocs. v. O'Gorman,* 199 F.3d 50, 59 (1st Cir. 1999) (quoting *Renton,* 475 U.S. at 46, 106 S.Ct. 925).[10]

---

**9.** In *Renton,* the Supreme Court identified several legitimate purposes related to the secondary effects of adult-entertainment businesses that such an ordinance may properly serve: "to prevent crime, protect the city's retail trade, maintain property values, and generally protect and preserve the quality of the city's neighborhoods, commercial districts, and the quality of urban life." *Renton,* 475 U.S. at 48, 106 S.Ct. 925 (internal quotation marks omitted).

**10.** This standard was articulated somewhat differently in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968):

[A] government regulation is sufficiently justified if it is within the constitutional

Plaintiff contends that the strict-scrutiny standard applies in this case because the Mendon by-laws explicitly and exclusively single out adult-entertainment businesses and impose regulatory burdens on them. However, the crucial inquiry is not whether the zoning by-laws apply specifically to adult-entertainment businesses. *See Renton*, 475 U.S. at 47, 106 S.Ct. 925 ("To be sure, the ordinance treats theaters that specialize in adult films differently from other kinds of theaters. Nevertheless, ... the Renton ordinance is aimed not at the content of the films shown ... but rather at the secondary effects of such theaters on the surrounding community."); *National Amusements v. Town of Dedham*, 43 F.3d 731, 740 (1st Cir.1995) (rejecting argument that hours-of-operation restriction that singled out film cinemas was subject to strict scrutiny). Rather, it is whether the "predominate" purpose in enacting the by-laws was to suppress such forms of expression or, instead, to mitigate negative secondary effects that those establishments may have on the surrounding community. *Alameda Books*, 535 U.S. at 440–41, 122 S.Ct. 1728.

■ It is clear that the Court may consider a wide range of materials in determining whether the predominant intent of an ordinance is to target secondary effects. For example, in *D.H.L. Associates*, the First Circuit determined that an adult-entertainment ordinance targeted secondary effects based on consideration of (1) testimony of the chairman of the town's board of selectmen, (2) the experiences of surrounding towns with adult-entertainment establishments, and (3) residents' voiced concerns about crime generated by adult businesses. 199 F.3d at 57–58.[11] The court did not find dispositive the fact that evidence of secondary effects did not appear in the minutes of the town meeting at which the ordinance at issue was adopted. *Id.* at 57. *See also National Amusements*, 43 F.3d at 742 (noting that legislatures may rely on evidence of past problems with a particular activity and need not conduct an investigation to corroborate each incident).

■ Here, the zoning by-law itself contains a preamble that articulates the purposes of the ordinance. It provides:

The purpose of this Adult Entertainment Overlay District section of the Town of Mendon Zoning Bylaws is to address and mitigate the secondary effects of adult entertainment establishments. Secondary effects impact the health, safety[,] and general welfare of the Town of Mendon and its inhabitants. These effects include increased crime, and adverse impacts on public health, the business climate, the property values of residential and commercial property[,] and the quality of life.

The provisions of this section have neither the purpose nor intent of imposing a limitation on the content of any com-

power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*Id.* at 377, 88 S.Ct. 1673. There is "little, if any," difference between the *O'Brien* and *Renton* standards. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 298–99, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984).

**11.** The Seventh Circuit has explicitly reasoned that the "predominate concerns" of a town body in enacting an ordinance may be evaluated "by examining a wide variety of materials including, but not limited to, the text of the regulation or ordinance, any preamble or express legislative findings associated with it, and studies and information of which legislators were clearly aware." *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 724 (7th Cir.2003).

municative matter or materials.... Similarly, it is not the purpose or intent of this Section ... to restrict or deny access to adult entertainment establishments or to sexually oriented matter or materials that is protected by the Constitutions of the United States and the Commonwealth of Massachusetts....

(Def. Ex. B at 25). In addition, the by-laws indicate that the size restrictions aim to preserve "the historically rural atmosphere of the town," and that the hours restriction seeks "to provide an opportunity for all elementary school buses to finish student bus routes." (*Id.* at 27–28).

■■■ Of course, "it is no answer" to a constitutional challenge for a town to assert that its zoning ordinance "contains the proper constitutional phrases." *Nationalist Movement v. City of Boston*, 12 F.Supp.2d 182, 194 (D.Mass.1998); *see also Northshor Experience, Inc. v. City of Duluth*, 442 F.Supp.2d 713, 721 (D.Minn.2006) ("[T]he mere inclusion of a boilerplate finding that the statute is designed to combat adverse secondary effects does not satisfy the content-neutrality test."). However, the Court must give due credit to legislative statements of policy where, as here, they inform an inquiry into legislative purpose by identifying specific secondary effects that the town may target without offending the constitution. Such statements cannot be discredited merely on the basis of "an alleged illicit motive" on the part of the town in enacting the by-laws. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 292, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality opinion). Here, the statement of legislative purposes provides strong evidence that the size and hours restrictions

aim to mitigate secondary effects such as traffic, crime, property values, and the historic and aesthetic heritage of the town.

In addition to the text of the ordinance itself, the record of the process by which the zoning by-laws were amended demonstrates that secondary effects of adult entertainment were the predominate focus of the legislative debate. During the October 7, 2008 town meeting, Speak Out Mendon conducted a presentation in support of the proposed by-laws in which it identified crime, drug use, increased traffic from non-resident patrons of adult-entertainment establishments, and declining property values as secondary effects that the proposed area restrictions were designed to mitigate. (Def. Ex. A at 121, 123–28, 131). The group cited several studies that have documented the negative effects of adult-entertainment businesses in other towns to justify its concern with those effects. (*Id.* at 124–28).[12]

Plaintiff contends that the true purpose of the hours restriction is not to ameliorate traffic, but to prevent exposure of the regulated activity to children who ride the school bus. Because "[r]egulations that focus on the direct impact of speech on its audience" concern primary, not secondary, effects of expression, *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), plaintiff argues that the hours restriction must be reviewed under strict scrutiny. Surely plaintiff does not mean to suggest that the school children of Mendon will be among the audience exposed to the speech—that is, to erotic nude dancing. Thus, *Boos*—which concerned a statute that aimed to shield foreign emissaries

---

**12.** The town has also submitted numerous studies, reports, and articles that (it asserts) the drafters of the by-law amendments considered during the drafting process. (*Id.* at 315–48, 380–525, 594–745, 753–72, 1016–1104). It is not clear what is the evidentiary basis for their assertion that those documents

were actually considered at that time. In any event, the Court does not rely on that allegation in finding that concern over secondary effects of adult-entertainment businesses was the primary motivation for the zoning by-laws.

from political demonstrations critical of their governments that they would otherwise see in public—has no applicability. In any event, the stated purpose of the hours restriction is not to shield children from nude dancing, but "to provide an opportunity for all elementary-school buses to finish student bus routes." As defendants point out, that purpose evinces a concern with traffic congestion, not suppression of speech.

In sum, the text of the zoning by-laws and the presentation by Speak Out Mendon at the October 7, 2008 town meeting demonstrate that the predominate motivation for the zoning by-laws was concern regarding crime, traffic, property values, and other secondary effects of adult-entertainment businesses. Accordingly, the regulations will be reviewed under the intermediate level of scrutiny outlined in *Renton.*[13]

### 2. Application of Renton Standard

#### i. Substantial Government Interest Requirement

The first inquiry under *Renton* is whether the size and hours restrictions are designed to serve a substantial government interest. *D.H.L. Associates,* 199 F.3d at 59.

▮▮▮ To show the presence of a substantial government interest, the town must "demonstrate a connection between the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Alameda Books,* 535 U.S. at 441, 122 S.Ct. 1728. In *Alameda Books,* the plurality of the Court described a burden-shifting framework for evaluating whether a municipality has demonstrated such a connection:

> [A] municipality may rely on any evidence that is "reasonably believed to be relevant" for demonstrating a connection between speech and a substantial, independent government interest.... If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton.* If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.

*Alameda Books,* 535 U.S. at 438, 122 S.Ct. 1728.

▮▮▮ The municipality's initial burden appears to require no more than a common-sense judgment as to the relationship between the regulated conduct and its potential secondary effects. *Id.* Although a municipality may not rely on "shoddy data or reasoning," *id.,* it is not required to "demonstrate empirically that its proposed regulations will or are likely to successfully ameliorate adverse secondary effects," *Richland Bookmart, Inc. v. Knox Cnty., Tenn.,* 555 F.3d 512, 524 (6th Cir.2009).

---

13. The standard of intermediate scrutiny defined in *Renton* applies with respect to review of the zoning bylaws under both the First Amendment and Article 16 of the Massachusetts Declaration of Rights. *See D.H.L. Assocs. v. Board of Selectmen,* 64 Mass.App.Ct. 254, 256, 833 N.E.2d 149 (2005) (holding that although Article 16 "can provide greater protection for nude dancing than the First Amendment in other circumstances," no expanded protection is available where a town does not prohibit such activities entirely, but rather uses zoning by-laws "to advance the substantial governmental interests of curbing crime, preserving property values, and minimizing dangers to public health," and that "[w]hen a municipality employs its zoning power in this fashion, Massachusetts courts have traditionally utilized the Federal standard to assess the constitutionality of the challenged zoning ordinance under art. 16").

Here, the town clearly satisfies its initial burden as to both restrictions. It is entirely reasonable to expect that the size and hours of operation of an adult-entertainment facility will influence the impact it has on its surroundings and on the traffic patterns it generates.

■ Once a municipality meets its initial burden, the party challenging an ordinance must provide "actual and convincing" evidence to cast doubt on that showing. *Alameda Books,* 535 U.S. at 438, 122 S.Ct. 1728. Such evidence must be sufficient to "convincingly discredit the foundation upon which the government's justification rests." *Imaginary Images, Inc. v. Evans,* 612 F.3d 736, 747 (4th Cir. 2010).

■ Plaintiff contends that the size and hours restrictions address neither the impact of adult entertainment on the surrounding community nor the traffic it will generate. As to the first concern, it points out that the area surrounding 49 Milford Street includes several developments that are larger than 2,000 square feet and that do not appear particularly "rural in character." [14] In addition, it argues that Mendon's zoning by-laws adequately address the exterior appearances of adult-entertainment businesses with other requirements. (Pl.'s Appx. # 2 at 237). As for traffic congestion, plaintiff cites the Greenman–Pedersen study, which concluded that the traffic impacts of the proposed 6,800 square-foot establishment would have been "negligible." (*Id.* at 93). It argues that the restrictions are superfluous because the Board of Selectmen already has authority to deny an entertainment license to "prevent an unreasonable increase in ... vehicular traffic." Mass. Gen. Laws ch.

140, § 183A. Because the purported purposes of the size and hours restrictions may also be served by other regulations, plaintiff contends that the by-laws are not genuinely designed to promote those interests, but instead to suppress expression.

Plaintiff's objections do not convincingly discredit the town's asserted foundation for its zoning restrictions. The fact that other provisions in the zoning by-laws and in the Massachusetts licensing statute address the same aesthetic and practical concerns as the challenged restrictions does not undermine the town's justification for those zoning rules. Rather, it reenforces the town's assertion that it has a substantial interest in the mitigation of those impacts. Although the Greenman–Pedersen study suggests that the town's concerns regarding traffic may be overstated, that study, as several residents noted at the October 7, 2008 meeting noted, did not account for the effect of a nearby drive-in movie theater on cumulative traffic patterns. (Pl.'s Appx. # 2 at 158–59). Finally, the fact that some large structures now exist on Milford Street does not detract from the town's concern that additional structures—particularly ones dedicated to adult entertainment—would further detract from the rural character of the town as a whole.

■ Even assuming that plaintiff did adequately refute the town's initial premise for adopting the by-laws, the town has offered ample evidence to support them. A municipality may justify for an ordinance through a wide variety of means. *See Renton,* 475 U.S. at 51–52 (1986) (noting that municipality may rely on the experiences of other cities and does not need to

14. Those developments include self-storage facilities (totaling 6,900 square feet), an electric utility substation, a service garage (7,500 square feet), a garden and landscape supply store (2,595 square foot), and a drive-in movie theater with a capacity of 700 vehicles. (Pl.'s Appx. # 2 at 188–199, 200–205). Several of those developments include structures that have more than one story and presumably exceed 14 feet in height. (*Id.*).

conduct independent studies, "so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses"). Even post-enactment studies may be offered to demonstrate the constitutionality of the ordinance. *See Alameda Books,* 535 U.S. at 441, 122 S.Ct. 1728 (distinguishing the evidentiary burden for showing a substantial interest from that for showing the motivation behind the ordinance); *Center for Fair Pub. Policy v. Maricopa Cnty.,* 336 F.3d 1153, 1166 (9th Cir.2003). In other words, the Court will not lightly disregard the town's determination that it has a substantial interest in mitigating secondary effects caused by adult-entertainment establishments within its borders. *G.M. Enterprises v. Town of St. Joseph,* 350 F.3d 631, 639–40 (7th Cir.2003) ("*Alameda Books* does not require a court to re-weigh the evidence considered by a legislative body, nor does it empower a court to substitute its judgment in regards to whether a regulation will best serve a community.").[15]

▆ The town has clearly satisfied its burden under this standard. As to its concern with property values and the aesthetic character of the town, numerous studies have documented a relationship between adult-entertainment businesses and blight. (Def.'s Ex. A at 333–34, 435–38, 540–43, 669–71, 765). Some support exists for the proposition that the negative effect of such establishments on property values is magnified in small towns. (*Id.* at 124–28, 201, 225–26). Furthermore, the town notes that an appraiser in one study identified "exterior building appearance" among the factors that affect property values. (*Id.* at 541). According to another study, "[t]he more visible a sexually-oriented business is, the more impact is has." (*Id.*

at 721). Based on this evidence, it would be reasonable for the town to conclude both that an adult-entertainment facility would adversely effect its substantial interests in maintaining property values and the rural atmosphere of the Town and that a larger facility would have greater effects than a smaller one.

With respect to traffic, the Town relies on studies that support its belief that, particularly in comparable small towns, adult-entertainment businesses may increase congestion substantially. (Def. Ex. A at 226, 423, 496, 502, 516, 518). Moreover, during public hearings regarding Showtime's proposal, residents of the area testified that Route 16 is a busy roadway. (Pl.'s Appx. # 2 at 39, 158). Showtime's original proposal contemplated a 8,935 square-foot structure with 244 seats and 25 employees, whereas the 2,000 square-foot structure described in their 2010 proposal included only 73 seats and 20 employees. (Pl.'s Appx. at 34, 40, 158). Finally, Speak Out Mendon offered evidence that adult-entertainment establishments in towns like Mendon tend to draw patrons from neighboring regions, suggesting that such businesses are especially likely to increase traffic congestion. (Def. Ex. A at 128). In light of these considerations, the town reasonably could have concluded that a larger building that accommodated more patrons and employees would result in more vehicles traveling to and from the premises, and that restricting the size of the structure would mitigate the establishment's traffic impacts. In addition, because those traffic effects could hinder the town's school-bus service, the town has an interest in regulating hours of operation to prevent that conflict.

---

**15.** *Accord Richland Bookmart,* 555 F.3d at 527 ("[E]vidence suggesting that a different conclusion is also reasonable does not prove

that the County's findings were impermissible or its rationale unsustainable.").

In sum, the town has demonstrated that the zoning by-laws were designed to serve the town's substantial government interests in mitigating the traffic-related and aesthetic impacts that an adult-entertainment establishment might have in their town.

### ii. *Narrowly Tailored Requirement*

The second question under *Renton* is whether the zoning by-laws are narrowly tailored to their purpose of promoting those government interests. *D.H.L. Associates*, 199 F.3d at 59.

 A content-neutral time, place, and manner restriction is narrowly tailored if it " 'promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Id.* at 59 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). A zoning ordinance that regulates adult entertainment may be deemed narrowly tailored for these purposes if it "affect[s] only that category of [establishments] shown to produce the unwanted secondary effects," *Renton*, 475 U.S. at 52, 106 S.Ct. 925, and if it affects only the aspects of adult-entertainment businesses that may generate the targeted secondary effects. *D.H.L. Associates*, 199 F.3d at 59 (upholding zoning ordinance that "applie[d] directly to adult entertainment providers [and] does not reach other forms of entertainment," noting that it "confine[d] the impact of the restriction ... and [did] not impact other aspects of the activity").

 That is the case here. The zoning by-laws apply by their terms only to adult-entertainment establishments—that is, adult bookstores, theaters, video stores, and strip clubs. (Def. Ex. B at 1). Furthermore, the size and hours restrictions are limited in scope to aspects of adult-entertainment business—visual prominence and hours of operation—that are connected to the town's interest in protecting property values and preventing undue traffic congestion while its school buses complete their routes.

 With respect to the size restrictions, plaintiff nonetheless contends that the zoning by-laws are improper because the town's interest in reducing traffic and protecting property values would be better served by restricting adult-entertainment businesses not by size or height, but by design review.[16] However, plaintiff's belief that a different ordinance would better effectuate the town's stated purposes does not put the zoning by-laws outside the range of valid regulatory strategies. *Renton*, 475 U.S. at 52, 106 S.Ct. 925 ("[A] city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.").[17]

Plaintiff also relies on *Peek–A–Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, 337 F.3d 1251, 1266 (11th Cir.2003). In *Peek–A–Boo*, the Court reversed an order of summary judgment in favor of a county regarding the validity of an ordinance that regulated the size of rooms within adult-dancing establishments, find-

---

**16.** In plaintiff's words: "A 2,000 square foot building less than 14 feet in height with an orange and green polka dot facade is far more visually intrusive than a traditionally designed larger building with clapboard siding." (Pl.'s Mem. # 2 at 19).

**17.** Plaintiff also suggests that the hours restriction will not promote the town's purpose because children will be able to see the exteri-

or of the establishment even if it is not in operation until 4:30 p.m. However, that argument erroneously assumes that the purpose of that by-law is to shield children from the psychological effects of seeing or being aware that adult-entertainment establishments exist. Because the hours restriction clearly promotes the town's interest in preventing traffic congestion while school buses finish their routes, it is tailored to its purpose.

ing that the requirement was not tailored to its alleged purpose because "the County failed to rely on any evidentiary foundation" connecting the regulation to any secondary effects. *Id.* at 1274, 1267. Even assuming that *Peek–A–Boo* represents the law in this circuit, its holding simply does not apply here. Unlike the county in that case, the town has cited evidence that a larger structure will have a greater aesthetic impact and that the proposed club will aggravate traffic congestion during its hours of operation. (Def. Ex. A at 226, 423, 496, 502, 516, 518). That is sufficient to meet the town's burden of showing that the secondary effects of adult entertainment on property values and traffic may be more effectively mitigated with the zoning by-laws than without them.

With respect to the hours restrictions, plaintiff relies on *Capitol Movies, Inc. v. Passaic,* 194 N.J.Super. 298, 476 A.2d 869 (App.Div.1984), in which the court invalidated an ordinance that prohibited theaters from screening x-rated films between 7 p.m. and midnight. That decision, however, rested on the court's findings that the ordinance aimed "to protect the welfare of the children of the City from whatever unarticulated dangers or adverse influences" the theater posed and that it "severely restricts the hours of operation" of the theaters, leaving no reasonable alternative avenues for expression. *Id.* at 301–02, 306, 476 A.2d 869. Here, the town relies not on fears that adult entertainment will corrupt the youth, but on concerns that traffic will interfere with its municipal operations. Its hours restriction is limited to times when that concern is particularly salient and does not apply during the evening.[18] Thus limited, it is sufficiently narrow in scope.[19]

■ Plaintiff also contends that the zoning by-laws are unconstitutionally underinclusive because other businesses that have the same secondary effects as adult-entertainment establishments remain unregulated by the town. Underinclusiveness, however, does not invalidate an otherwise-permissible zoning ordinance, at least where, as here, it is well-supported by a substantial government interest. *See R.A.V. v. St. Paul,* 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("[T]he First Amendment imposes not an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech."); *but see Northeast Theater Corp. v. Jordan,* 445 F.Supp. 744, 748 (D.Mass.1978) (holding that "underinclusion is often sustainable where it appears in the context of economic regulation," although "it must be supported by a more substantial governmental interest").

In sum, because the zoning by-laws are directed only at adult-entertainment establishments, and only at aspects of such businesses that the town reasonably believes are likely to contribute to unwanted secondary effects, they are sufficiently narrowly tailored.

### iii. *Alternative Avenues of Communication Requirement*

The final requirement under *Renton* is that the zoning by-laws allow for reasonable alternative methods of communication. *D.H.L. Associates,* 199 F.3d at 59.

---

18. Mass. Gen. Laws ch. 140, § 183A prohibits any activity that requires an entertainment license before 1 p.m. on the afternoon. Thus, the additional effect of the town's zoning by-law is merely to restrict operation for several hours in the afternoon on days when school is in session.

19. At least one court has upheld a similar restriction on hours of operation, even where the proffered justification for the ordinance was essentially moralistic. *See Bright Lights v. City of Newport,* 830 F.Supp. 378, 389 (E.D.Ky.1993).

The crux of this questions is "not 'whether a degree of curtailment' of speech exists, but rather 'whether the remaining communicative avenues are adequate.'" *Id.* (quoting *National Amusements,* 43 F.3d at 745).

Here, the zoning by-laws leave owners of adult-entertainment establishments substantial leeway in the operation of their clubs. It is true that the size restriction will limit both the amount of nude dancing that is technically possible at the Showtime club and the number of clients who may attend the club at any time. However, for constitutional purposes, a one-story, 2,000 square-foot facility will provide a reasonable alternative to the more massive venue plaintiff would prefer. Similarly, the hours restriction, which permits operation of such clubs in the evenings and on all days when school is not in session, leaves ample opportunities for expression.

### iv. *Conclusion*

In sum, because the zoning by-laws are narrowly tailored to serve the town's substantial government interests in protecting property values and avoiding traffic congestion while allowing for reasonable alternative avenues of communication, they are constitutionally valid under the principles of *Renton. See D.H.L. Associates,* 199 F.3d at 59.

### D. *General By–Laws (Alcohol Restriction)*

The alcohol restriction is contained in Chapter XXV of the town's general by-laws. As passed by the town and approved by the Massachusetts Attorney General, it provides:

1. The Town of Mendon shall not grant any license for the sale of alcohol for consumption ... to any Adult Entertainment or Use establishment ... as the presence of alcohol is documented to exacerbate negative secondary crime effects at sexually-oriented businesses.

2. The Town of Mendon shall not grant any special licenses for the sale of alcohol for consumption ... to any Adult Entertainment or Use establishment ... as the presence of alcohol is documented to exacerbate negative secondary crime effects at sexually-oriented businesses.

3. The Town of Mendon shall not allow patrons of Adult Entertainment or Use establishments to consume alcoholic beverages within any Adult Entertainment or Use establishment, even if such beverages are brought to the premises by the patrons as a presence of alcohol is documented to exacerbate negative secondary crime effects at sexually-oriented businesses.

4. In the event that an establishment already in possession of a license [to sell or serve alcohol] applies for a license to operate an Adult Entertainment or Use, such establishment shall only be granted a license to coincide with the expiration of its [liquor license] and this license will not be renewed.

(Pl.'s Appx. # 4 at 111). Plaintiff contends that this alcohol restriction runs afoul of Article 16 of the Massachusetts Declaration of Rights.[20]

### 1. *Level of Scrutiny*

The Supreme Judicial Court has held that ordinances regulating adult entertainment by means of the state's liquor-licensing authority may violate Article 16. *Sees,*

---

**20.** Plaintiff concedes that the alcohol restriction does not offend the First Amendment. Accordingly, the Court does not address its validity under the federal Constitution.

374 Mass. at 536, 373 N.E.2d 1151 (vacating conviction of a bar manager for violation of an ordinance that banned nude or seminude dancing at licensed bars); *Cabaret Enterprises*, 393 Mass. at 16–17, 468 N.E.2d 612 (extending principle of *Sees* to civil context and enjoining the revocation of a bar's liquor license based on nude dancing presented in violation of state statute that prohibited all barroom nudity).[21] Plaintiff contends that those cases preclude any ordinance that, like the by-laws at issue here, bans nude dancing at establishments where alcohol is sold and consumed.[22]

**21.** In contrast, the Supreme Court has held that states may, as an exercise of their general police power, prohibit nude dancing in drinking establishments without offending the First Amendment. *See California v. LaRue*, 409 U.S. 109, 118, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) (holding that states have authority under their police power and the Twenty–First Amendment to prohibit nude dancing on where alcohol is licensed to be served), *overruled in part by 44 Liquormart v. Rhode Island*, 517 U.S. 484, 515, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ("Without questioning the holding in *LaRue*, we now disavow its reasoning insofar as it relied on the Twenty–First Amendment.").

**22.** Defendants distinguish *Sees* and *Cabaret* on the grounds that the by-laws do not ban nude dancing at licensed bars, but instead prohibit alcohol at establishments that present nude dancing. Of course, the sale, solicitation, and consumption of alcohol is not expressive conduct protected by Article 16. However, in *Cabaret Enterprises*, the SJC rejected the proposition that municipality may disguise a ban on expressive conduct as a mere license condition:

The commission also argues that [a licensing statute that conditioned liquor licenses on the prohibition of nude dancing on licensed premises] "is a generic licensing law" and that we "should analyze the statute as an expression of the state liquor police power and not as a measure to directly or indirectly regulate or discipline the conduct of nude dancing." The commission would distinguish the present case from *Sees* by viewing [the statute] as regulating liquor sales, and viewing the ordi-

However, neither *Sees* nor *Cabaret* set forth a categorical rule against ordinances that ban nude dancing where liquor is served. Rather, the SJC held that Article 16 "does not permit the prohibition of non-obscene nude dancing on licensed premises *in the absence of a countervailing State interest.*" *Cabaret Enterprises*, 393 Mass. at 17, 468 N.E.2d 612 (emphasis added). Because the court acknowledged the possibility that such an interest might be proved on another record, its holdings were narrowly drawn to the facts of those cases. *See Sees*, 374 Mass. at 537, 373 N.E.2d 1151 ("No governmental interest is

nance considered in *Sees* as regulating nude performances. However, although the statute and the ordinance provide different sanctions for violation, both laws prohibit, and therefore regulate, nudity on licensed premises. It cannot fairly be said that the statute regulates liquor sales but not nudity, and the ordinance regulates nudity but not liquor sales.

393 Mass. at 17–18, 468 N.E.2d 612. Accordingly, the by-laws at issue here must be analyzed as bans on nude dancing in places licensed to serve liquor notwithstanding their form as a liquor-licensing rule.

Defendants also argue that *Sees* and *Cabaret Enterprises* are inapplicable because they involved as-applied challenges, whereas plaintiff here contends that the by-laws are facially invalid. In *Revere v. Aucella*, 369 Mass. 138, 338 N.E.2d 816 (1975), the SJC held that an ordinance that prohibited any establishment allowing "open and gross lewdness and lascivious behavior" on its premises from receiving a license to sell alcohol was "not invalid on its face." *Id.* at 146, 338 N.E.2d 816. The ordinance in *Aucella*, however, prohibited not only nude dancing and adult entertainment, but also prostitution, sexual contact between employees and clientele, and other activities that are not constitutionally protected. Thus, plaintiffs in that case could not demonstrate that the "law admits of no valid application," as is required to sustain a facial constitutional challenge. *McGuire*, 260 F.3d at 47. Here, by contrast, the by-laws are directed solely at expressive conduct, and plaintiff's facial challenge is not barred by the decision is *Aucella*.

shown...."); *Cabaret Enterprises,* 393 Mass. at 17, 468 N.E.2d 612 (invalidating ban because the city had not demonstrated "in the record or by legislative history that there is a rational basis to conclude that such a restraint is required for the protection of the public").

■■■ The SJC has subsequently confirmed that narrow reading of *Sees* and *Cabaret Enterprises* and clarified that ordinances regulating nude dancing through the State's liquor-licensing authority must be evaluated under a standard of intermediate scrutiny:

> In prior cases in which we have had occasion to review ordinances restricting nudity in establishments licensed for the sale of alcohol, it was not necessary for us to apply the "narrowly tailored" prong of intermediate scrutiny. The records in both cases failed to demonstrate any justification for the imposition of a restraint on the exercise of a right guaranteed by art. 16. Here, on the other hand, the city has at least advanced and attempted to document a governmental interest in banning public nudity.

*Mendoza,* 444 Mass. at 198, 827 N.E.2d 180 (alterations, quotation marks, and citations omitted). *See also T & D Video v. City of Revere,* 423 Mass. 577, 581, 670 N.E.2d 162 (1996) (without distinguishing between First Amendment and Article 16 analysis, noting that municipality "made no attempt to justify its ... ordinances by reference to the secondary effects of sexually oriented businesses.... The legislative record is barren."). It is therefore apparent both (1) that Massachusetts courts apply the secondary-effects doctrine to determine the degree of scrutiny that applies to an ordinance under Article 16 and (2) that for content-neutral regulations reviewed under intermediate scrutiny, "the analysis under art. 16 is generally the same as under the First Amendment ...

[although] art. 16 [may] call for a different result." *Mendoza,* 444 Mass. at 201, 827 N.E.2d 180.

■■■ Here, it is beyond dispute that the alcohol prohibition targets the negative secondary effects of adult entertainment. The by-laws themselves specify that the rationale for the alcohol prohibition is that "the presence of alcohol is documented to exacerbate negative secondary crime effects at sexually-oriented businesses." (Pl.'s Appx. # 4 at 51). In addition, the records of the October 7, 2008 special town meeting demonstrate that crime associated with nude dancing and adult entertainment—especially where such activities are combined with consumption of alcohol—was a predominant consideration during the enactment of the by-laws. (Def. Ex. A. at 125–31). Accordingly, the alcohol restriction must be analyzed as a content-neutral regulation subject to intermediate scrutiny.

### 2. *Application of Intermediate Scrutiny*

■■■ As previously noted, intermediate scrutiny requires the town to demonstrate (1) that the alcohol-prohibition by-laws are designed "to serve a substantial government interest" unrelated to the suppression of free expression, (2) that they are "narrowly tailored" to that purpose, and (3) that they allow for "reasonable alternative avenues of communication." *Mendoza,* 444 Mass. at 197, 827 N.E.2d 180 (citing *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)).

The first requirement is clearly met by the town's interest in preventing crime associated with adult entertainment. Preventing crime is "without doubt [a] substantial government interest[ ]." *Mendoza,* 444 Mass. at 198–99, 827 N.E.2d 180. The town has provided strong evidence that the presence of alcohol at or near adult-enter-

tainment establishments exacerbates crime. (Def. Ex. A at 125, 199, 212–13, 217, 364, 383, 386, 478, 521, 569–70, 572, 1006). These studies confirm what courts have accepted as a matter of common sense—that "liquor and sex are an explosive combination." *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1124 (7th Cir.2001). Plaintiff criticizes the methodology and conclusions of the studies defendants cite, but does not meet its burden of showing that the town's evidence fails to support its rationale. It is sufficient that the town reasonably relied on evidence demonstrating a connection between the service of alcohol at adult businesses and an increase in crime. *Alameda Books*, 535 U.S. at 438, 122 S.Ct. 1728. Because the by-laws are clearly designed to further the town's interest in preventing that effect, they meet the first requirement of intermediate scrutiny. *Flanigan's Enters. v. Fulton Cnty.*, 596 F.3d 1265, 1277 (11th Cir.2010) (finding that substantial-interest requirement was "easily met" with respect to a comparable ordinance and that the alcohol prohibition furthered that interest).

The second requirement—that the ordinance be "narrowly tailored"—is also clearly satisfied by the alcohol-prohibition by-laws. The licensing rule prohibits adult entertainment in establishments that wish to serve alcohol or to allow it to be consumed on their premises. In doing so, it targets precisely the combination of mischiefs—sexual entertainment and intoxication—that the town reasonably suspects will increase crime. Because it addresses the class of establishments shown to produce the unwanted secondary effects—and no more—the alcohol prohibition can be expected to "promote a substantial government interest that would be achieved less effectively absent the regulation." *D.H.L. Associates*, 199 F.3d at 59.

Finally, the alcohol prohibition satisfies the third requirement, because it does not "unreasonably limit[ ] alternative avenues of communication." *Mendoza*, 444 Mass. at 198, 827 N.E.2d 180. The fact that the prohibition operates as a ban against nude dancing at businesses licensed to sell alcohol is not determinative. *See National Amusements*, 43 F.3d at 745 ("[T]he lens of inquiry must focus not on whether a degree of curtailment exists, but on·whether the remaining communicative avenues are adequate."). The by-laws do not prohibit nude dancing generally; they merely exclude it from the class of establishments at which the town's interest in crime prevention is most acute. *Cf. Mendoza*, 444 Mass. at 199, 827 N.E.2d 180 (invalidating general ban against nudity). Because it leaves other adult-entertainment establishments "ample capacity to convey the dancer's erotic message," *Pap's A.M.*, 529 U.S. at 301, 120 S.Ct. 1382, it satisfies the final requirement of intermediate scrutiny.

In sum, because the town has demonstrated that the alcohol restriction in its general bylaws is narrowly tailored to promote a substantial government interest in preventing crime while leaving other avenues of expression available, it does not violate Article 16.

### E. Massachusetts Civil Rights Act Claims ·

Plaintiff also contends that the by-laws violate its rights under the MCRA. In its cross-motion for summary judgment, defendants seek dismissal of plaintiff's MCRA claims.

██ The MCRA prohibits interference with the exercise or enjoyment of rights secured by the federal or state constitution or laws by means of "threats, intimidation or coercion." Mass. Gen. Laws ch. 12, § 11I. However, "a municipality cannot be sued under the MCRA." *Kelley v. La-*

*Force,* 288 F.3d 1, 11 (1st Cir.2002) (citing *Howcroft v. City of Peabody,* 51 Mass.App. Ct. 573, 591–92, 747 N.E.2d 729 (2001) (concluding that a municipality is not a "person" within the terms of the MCRA)).

Plaintiff does not deny that its MCRA claims are barred under these principles. Accordingly, summary judgment will be granted in favor of defendants as to those claims.

### III. *Motion for Attorneys' Fees*

▮▮▮▮ In an action under Section 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs. . . ." 42 U.S.C. § 1988.[23] Notwithstanding the statutory language, the Supreme Court has held that "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).[24] The First Circuit has thus "consistently held that despite the permissive phrasing of [§ 1988], [fee] awards in favor of prevailing civil rights plaintiffs are virtually obligatory." *De Jesus Nazario v. Rodriguez,* 554 F.3d 196, 200 (1st Cir.2009).

The Court granted plaintiff's motion for summary judgment as to Counts 1 and 2 of the complaint in its March 22, 2012 Memorandum and Order. Defendants do not dispute that plaintiff is accordingly a prevailing party entitled to a fee award with respect to those counts. Rather, their op-position concerns the amount of fees requested by plaintiff.

▮▮▮▮ The determination of a fee award begins with the calculation of the lodestar, which consists of the number of hours reasonably expended multiplied by a reasonable hourly rate. *Hutchinson v. Patrick,* 636 F.3d 1, 13 (1st Cir.2011). The party seeking the award has the burden of producing materials to support its request, including "counsel's contemporaneous time and billing records, suitably detailed, and information [concerning] the law firm's standard billing rates." *Id.* (citing *Gay Officers Action League v. Puerto Rico,* 247 F.3d 288, 295–96 (1st Cir.2001)). The court must then "calculate[ ] the time counsel spent on the case, subtract[ ] duplicative, unproductive, or excessive hours, and . . . appl[y] prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." *Gay Officers Action League,* 247 F.3d at 295.

Counsel for plaintiff have provided time records for their work on the first motion for summary judgment and request $41,369 in attorneys' fees and $350 in costs.[25] The requested fees represented 78.38 hours of work by attorney Thomas Lesser at an hourly rate of $350 and 69.68 hours of work by his associates at an hourly rate of $200.

### A. *Time Reasonably Expended*

Defendants contest a number of billing entries on the grounds that (1) they over-

---

**23.** To qualify as a prevailing party under a federal fee-shifting statute, a litigant must show that a material alteration of the parties' legal relationship has taken place as a result of the litigation. *Buckhannon Bd. & Care Home v. West Virginia Dep't of Health & Human Res.,* 532 U.S. 598, 603–05, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

**24.** Conversely, a prevailing defendant "may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley,* 461 U.S. at 429 n. 2, 103 S.Ct. 1933.

**25.** This total accounts both for the reductions that plaintiff conceded in its reply memorandum and for the additional fees it requests for time expended on the reply memorandum itself.

lap with claims on which plaintiff has not prevailed, (2) they include unproductive tasks, and (3) they lack specificity.

■ As to the first objection, where a party has prevailed on a claim that is severable—that is, one that "rest[s] on different facts and legal theories" than other claims that have failed—the Court must award fees only for time spent litigating the successful claims. *Figueroa–Torres v. Toledo–Davila*, 232 F.3d 270, 278 (1st Cir. 2000); *see also Coutin v. Young & Rubicam P.R.*, 124 F.3d 331, 339 (1st Cir.1997).

■ Plaintiff does not contest that its claim against the special-permit requirement (Counts 1 and 2) was severable from its other claims; time attributed to that claim that overlaps with the other claims may accordingly be reduced. On this basis, defendants seek reductions as to entries related to the preparation of the complaint and service of process. As plaintiff indicates, some of that work would have taken the same amount of time to complete even if Counts 1 and 2 were the only counts included in the complaint.[26] However, the billing entries include 5.33 hours of attorney Kent's time expended on preparation of the complaint—a task that certainly would have taken less time if plaintiff had asserted fewer claims. The Court will therefore reduce the fee award to reflect two fewer hours of attorney Kent's time.

■ Defendants next contend that 11.74 hours of billed time correspond to tasks that were unproductive because they did not assist the litigation of Counts 1 and 2. Again, several of those entries relate to discovery tasks that would have occurred regardless of whether plaintiff asserted any other claims and therefore were not unproductive.[27] Nonetheless, those tasks would have taken less time had plaintiff asserted fewer claims. The fee award will therefore be reduced to reflect one hour less of attorney Lesser's time.

■ Defendants next contend that various billing entries do not adequately identify the factual or legal subject matter of the tasks. *See Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir.1992); *Williams v. Town of Randolph*, 574 F.Supp.2d 250, 253 (D.Mass.2008). Three of those entries refer to "legal research" but do not identify the claims to which the research related.[28] However, given the timing of those entries (May 14, 16, and 31, 2011), it is reasonably clear that the research concerned the summary judgment motion on Counts 1 and 2, which was being briefed by the parties at the time. In context, the entries are sufficiently specific. *Parker v. Town of Swansea*, 310 F.Supp.2d 376, 392 (D.Mass.2004) (holding that billing entries are sufficiently precise where "the subject matter and nature of the tasks are either explicitly stated or readily ascertainable"). No adjustment is necessary because of vague billing entries.

■ Defendants also contend that a set of billing entries corresponds to "non-core" work for which a lower fee rate should be

---

26. Such tasks include (a) the preparation of a Local Rule 16(d)(3) certification (0.17 hours), (b) review of Mendon's answer to the complaint (0.25 hours), (c) preparation of a status conference report (0.50 hours), and (d) a telephone call to the client notifying him of the filing of the complaint (0.17 hours).

27. Those tasks include attorney Lesser's (a) preparation of answers to interrogatories (0.71 hours), (b) preparation of automatic disclosures (0.84 hours), (c) participating in a telephone status conference with the Court (0.25 hours), and (d) a telephone conversation with the plaintiff regarding the status of the case (0.17 hours).

28. The other entries, which refer to review of the case file and communications with the client, are sufficiently specific for present purposes.

awarded. A court determining a fee award may distinguish between "core" and "non-core" legal work "to prevent attorneys from earning their regular lawyers' fees for work that could be performed by a less skilled employee." *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F.Supp.2d 86, 95 (D.Mass.2005).[29] Core work includes "legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring, and implementation of court orders." *Brewster v. Dukakis*, 3 F.3d 488, 492 n. 4 (1st Cir.1993). Non-core work includes simple or administrative tasks such as letter writing and telephone conversations. *Id.*

 Time spent drafting a fee petition "is considered non-core because it involves 'little more than documenting what a lawyer did and why he or she did it.'" *Alfonso v. Aufiero*, 66 F.Supp.2d 183, 196 (D.Mass.1999) (quoting *Brewster*, 3 F.3d at 494). Defendants identified nine hours of attorney Lesser's time and 17.25 hours of his associates' time that was dedicated to the preparation of pleadings related to this motion for fees. Plaintiff indicates that preparation of its reply brief on fees required an additional 10.44 hours from attorney Lesser and 17.25 hours from one of his associates. (Lesser Aff. ¶ 8; Aleo Aff. ¶ 3). The Court finds the amount of time dedicated to the reply brief to be unreasonable under the circumstances and will reduce it to one hour of attorney Lesser's time and three hours of associates' time. Thus, the lodestar calculation will reflect 10 hours of non-core work by attorney Lesser and 20.25 hours of non-core work by his associates.

### B. *Reasonable Hourly Rates*

 Defendants also contend that plaintiff's counsel seeks an excessive hourly rate. The appropriate hourly rate for legal work is rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 955 (1st Cir.1984). Here, the relevant community is Worcester, "the community in which the court sits." *Alfonso*, 66 F.Supp.2d at 197.

 Plaintiff contends that a reasonable rate for work of attorney Lesser's skill and experience is $350. (Pucci Aff. ¶ 12). Defendants assert that the appropriate rate is $275. (Callan Aff. ¶ 7). Although this case does involve sophisticated legal issues that warrant some premium, plaintiff's requested rate appears to exceed the prevailing rate in this region of Massachusetts for similar work. The Court finds that an appropriate hourly rate for time spent by attorney Lesser is $300 for core work and $200 for non-core work.

For work performed by attorney Lesser's associates, plaintiff requests an hourly rate of $200. Defendants do not contest this rate, which is comparable to that charged by their own attorneys, $170. Accordingly, the fee award for work by associates will be calculated at an hourly rate of $200 for core work and $133 for non-core work.

### C. *Conclusion*

The Court's findings with respect to the lodestar calculation are summarized in the following chart.

---

**29.** The Court recognizes that the practice of distinguishing between core and non-core legal work is not universally accepted. *Compare Marrotta v. Suffolk Cnty.*, 726 F.Supp.2d 1, 5 (D.Mass.2010) (Young, J.) ("This Court . . . no longer recognizes such a distinction.")

with *McGahey v. Harvard Univ. Flexible Benefits Plan*, 685 F.Supp.2d 181, 185 (D.Mass. 2010) (distinguishing core and non-core work) *and Bogan v. City of Boston*, 432 F.Supp.2d 222, 231 (D.Mass.2006) (same).

| | Hours | Rate | Subtotal |
|---|---|---|---|
| Lesser (Core) | 57.94 | $300 | $17,382 |
| Lesser (Non-core) | 10 | $200 | $ 2,000 |
| Associates (Core) | 33.18 | $200 | $ 6,636 |
| Associates (Non-core) | 20.25 | $133 | $ 2,693 |
| | | **Fees Subtotal:** | $28,711 |

 Once it calculates the lodestar, the Court may adjust the amount of the final award to reflect other factors, including the results obtained and the time and labor actually required to handle the matter efficiently. *Torres–Rivera v. O'Neill–Cancel*, 524 F.3d 331, 336 (1st Cir.2008). Factors that it may consider in evaluating the "results obtained" include: (1) a party's success on each claim, (2) the societal importance of the rights at issue, and (3) the relief actually achieved. *Coutin*, 124 F.3d at 338. Here, the Court finds that each of those considerations favors a downward adjustment from the lodestar. The lodestar calculation will accordingly be reduced by 15%, to $24,404.56. In addition, plaintiff is entitled to court expenses consisting of the $350 fee for filing the complaint. The following table summarizes the total fee award.

| Adjusted Fees | $24,404.56 |
|---|---|
| Costs | $ 350.00 |
| Total Award | $24,754.56 |

## IV. *Conclusion*

For the foregoing reasons,

1. The second, third, and fourth motions of plaintiff Showtime Entertainment, LLC, for summary judgment are DENIED;

2. The cross-motion of defendants for summary judgment as to Counts 3–7 is GRANTED; and

3. Plaintiff is awarded $24,404.56 in reasonable attorneys' fees and $350

in reasonable costs with interest as provided by law.

**So Ordered.**